[Civ. No. 9372. Third Dist. Sept. 11, 1958.]

BOARD OF TRUSTEES OF THE WOODLAND UNION HIGH SCHOOL DISTRICT OF YOLO COUNTY, Respondent, v. RUSSELL S. MUNRO, as Director of the Department of Alcoholic Beverage Control, et al., Defendants and Appellants; THOMAS P. RALEY, Intervener and Appellant.

Edmund G. Brown, Attorney General, E. G. Funke, Assistant Attorney General, William T. Chidlaw and Robert W. Baker, Deputy Attorneys General, for Defendants and Appellants.

Downey, Brand, Seymour & Rohwer for Intervener and Appellant.

Anthony B. Avilla, District Attorney (Yolo), and Harry A. Ackley, Deputy District Attorney, for Respondent.

VAN DYKE, P. J.—This is an appeal from a judgment of the Superior Court for Yolo County, decreeing that a writ of mandate should issue against the appellant department and the appellant board, directing them to reverse their determination that a general off-sale liquor license should issue to Thomas P. Raley, the real party in interest. The basic question presented on this appeal is whether or not the Department of Alcoholic Beverage Control prejudicially abused its administrative discretion in granting the license.

The department made the following findings of fact: The proposed premises consist of a supermarket located in a neighborhood shopping center at the southeast corner of College Street and Granada Drive in the South Land Park area near the southerly outskirts of Woodland. The premises in question constitute one of a chain of eight Raley food markets, seven of which are located in Sacramento County, and all, or most of them, are licensed for off-sale general alcoholic beverages. There are presently no alcoholic beverage licenses in force in the vicinity of the premises. The applicant's store building is situated in the southerly part of the shopping center, and there is an adjacent main parking area immediately to the north of the applicant's building which is shared with patrons of a drive-in restaurant located at the corner of College Street and Granada Drive and with patrons of other retail stores in the shopping center. Immediately to the south of, and adjacent to, the proposed premises is another parking area reserved for the exclusive use of the applicant's customers. The main entrance to the applicant's store faces College Street, while a secondary entrance faces the general parking area to the north of the building. The nearest school to the proposed premises is the Woodland Union High School, located to the north of the premises and occupying land on both sides of College Street. The distance from the nearest point of the premises and the nearest point of the school property is approximately 365 feet. The evidence shows that the school board has under consideration the enlargement of the high school campus, which, although it occupies large areas of land on both sides of College Street lying to the north of the proposed premises, appears to be too small for present or proposed enlarged school activities. The distance from the proposed premises to the nearest point on school property could, by the additional school facilities proposed, be reduced to approximately 300 feet. Present enrollment of Woodland Union High School is approximately 1,000 students, which include age

groups ranging from 13 to 19. The 19-year-old group would constitute but a small fraction of the enrollment. A considerable number of students frequent the area near the proposed premises by reason of their patronage of the drive-in restaurant and their purchases of ice cream and candy bars at applicant's store. Complaints of the neighboring residents have been directed toward the practice of these students discarding papers such as candy wrappers and other debris around the shopping center during the noon lunch period, after school hours and during evening when sports events are held at the school. There is insufficient evidence to show that the package sale of alcoholic beverages by applicant would aggravate this litter problem or that consumption in public of alcoholic beverages in the vicinity is, or would be of such proportions as to add appreciably to the litter. The evidence shows that by far the greatest number of sales of alcoholic beverages sold at other markets of similar type, operated by applicant, are made in conjunction with purchase of grocery items for consumption at the purchasers' homes. The applicant does not propose to sell alcoholic beverages from open shelves or refrigerators accessible to patrons on a self-service basis as is usual in his other and in most food stores of this kind, but he has submitted a revised floor plan whereby refrigerated beer, wines and so-called hard liquors will be sold only at a separate department located at the front of the store in the southwest corner and outside the check stands. Persons desiring to purchase alcoholic beverages will only be able to procure them at this portion of the store, which will be in charge of a clerk at all times that the liquor department is open for business. The proposed arrangement should effectively minimize the possibility of theft of alcoholic beverages by high school students or others, and will safeguard against inadvertent sale of alcoholic beverages to minors by clerks at the food-checking stands at times when they are busy with customers purchasing large lots of groceries. A children's public playground will, at some time in the future, occupy a park area proposed to be constructed across College Street and opposite the proposed premises. The evidence does not show what portion of this proposed public park will be used for playground purposes such as swings and other play equipment. The width of College Street intervening between the proposed premises and the proposed park area is approximately 60 feet from curb to curb. A municipal swimming pool, which is patronized by increasing numbers of adults,

students and other children to the extent of a total of 43,548 persons in 1955, is located to the northwest and across College Street from the premises in question, at a distance of about 400 feet airline measured from the nearest portion of the applicant's store building to the nearest point of the swimming pool enclosure. This pool is surrounded by a high wall and, with the exception of the upper portions of bleacher seats located against the south wall of the pool enclosure, the view of the proposed premises from the pool area is effectively blocked. The American Lutheran Church, with a total membership of about 530 persons, and holding the usual services on Sundays and meetings on most week nights is located on the west side of College Street and across the street from the proposed premises at a distance of about 171 feet from the nearest point of the applicant's building to the nearest corner of the church property. An additional distance of about 25 feet to the nearest church entrance makes the distance about 196 feet. It is proposed to construct a Y.M.C.A. building in about two to three years on the lot adjacent to and south of the church across the street from the proposed premises, at a distance of about 150 feet from the premises, measured by direct line between the respective buildings. There is no substantial evidence to show that the granting of a license for the off-sale of packaged alcoholic beverages would, under the method of operation proposed, constitute an undue moral hazard to the students of the high school, the church activities of the persons attending the church, or juveniles using the facilities of the proposed playground or the proposed Y.M.C.A. The premises in question are located on Lot 16 of Block 4 in the tract known as South Land Park. By a ''Declaration of Restrictions'' signed by Anton Paulsen, his wife, and others, the then owners of the South Land Park Tract executed August 31, 1946, and which was recorded on September 7, 1946, certain restrictions were imposed on this tract, providing that all lots, with the exception of Lot 16 of Block 4 on which the shopping center and the proposed premises are located shall be restricted to residential use. As to Lot 16 of Block 4 it is provided that said lot is ''restricted to retail commercial purposes provided that no liquor or beverages shall be sold on said premises containing more than one-half of one per cent alcohol by volume.'' There is no evidence to show that issuance of the license in question would violate any valid zoning ordinance. It is stipulated, and it is found to be true, that the proposed premises are located in a shopping center, which, in turn, is located in a

general residential area. A search of the record discloses substantial support for the findings of fact.

The conclusions of the department from the foregoing findings were as follows: Issuance of the license would not be contrary to public welfare and morals for the reason that although the proposed premises are located within the immediate vicinity of (1) a portion of the high school grounds, (2) a proposed children's public playground, (3) a church and (4) a proposed Y.M.C.A., an off-sale license would not expose the persons or juveniles involved to any undue moral hazard. Issuance of the license would violate a deed restriction, which appears to be valid and enforceable as to all parties in privity therewith, but public welfare and morals would not, in view of the findings on all other issues herein, be adversely affected by the issuance of an off-sale general license to this applicant and premises. The proposed premises are located in a residential area, but issuance of the license would not be contrary to public welfare and morals.

The scope of review of a decision of the Department of Alcoholic Beverage Control, like that of the review of a decision of any administrative body given quasi-judicial powers by the Constitution, is well established. The Constitution declares that the department ''shall have the exclusive power . . . to license the manufacture, importation and sale of alcoholic beverages in this State, . . . . The department shall have the power, in its discretion, to deny, suspend or revoke any specific alcoholic beverages license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals. . . .'' ▮ In reviewing the decision of such an administrative body, the reviewing court is limited to the determination of whether or not the decision is supported by substantial evidence and the court may not substitute its view for that of the administrative body, nor reweigh conflicting evidence. (*Dethlefsen* v. *Board of Equalization,* 145 Cal.App.2d 561, 563 [303 P.2d 7]; *Molina* v. *Munro,* 145 Cal.App.2d 601 [302 P.2d 818].) ▮ The reviewing court, in its consideration of the evidence in support of the decision, must resolve conflicts, and indulge legitimate and reasonable inferences, in favor of that decision. (*Thompson* v. *City of Long Beach,* 41 Cal.2d 235, 241 [259 P.2d 649]; *Oxman* v. *Department of Alcoholic Beverage Control,* 153 Cal. App.2d 740, 744 [315 P.2d 484]; *Marcucci* v. *Board of Equalization,* 138 Cal.App.2d 605 [292 P.2d 264].) ▮ There

can be nothing in the nature of a trial de novo in the reviewing court.

■ Tested by the foregoing rules, there is substantial evidence in the record which supports the decision of the department and, therefore, its decision must be upheld and the judgment appealed from must be reversed.

Witnesses for the protestants testified that if liquors were sold in Raley's market, minors would find a way of getting it, either by pilfering it from the store or inducing adults to purchase it, take it out of the store and give it to the minors; that this would happen generally when students were attending various athletic games and contests during evenings such as football and basketball games; that the pilfering and illegal obtaining through intervention of adults would be increased by the propinquity of the market to the school grounds; that handy access to the liquor supply would increase use of intoxicants by adult attendants at the games; that minors would obtain liquor more readily at that market than they would at other markets through misrepresentation of their ages and having obtained it would permit its use by themselves and other students. Representatives of the nearby church testified that they opposed granting the license on the same grounds urged by the school authorities, but admitted that so far as the church congregation was concerned they did not expect any bad effects upon their membership. Representatives of the Y.M.C.A., which proposed to build in the future a building in the general vicinity of the market, testified that their membership would be more apt to indulge in the use of alcoholic beverages than if the same were not so handy to their headquarters. Many of these witnesses claiming to be well versed with juvenile problems, particularly those encouraged by the use of alcoholic beverages, gave it as their opinion that transfer of the license would adversely affect public welfare and morals, thus testifying directly to the very issue to be passed on by the board.

Assuming the admissibility of such opinion evidence, we think it apparent that the evidence given by protestants' witnesses did not, as a matter of law, prove that the granting of the transfer of the license by the board would be contrary to public welfare or morals.

The ultimate question whether or not under all the circumstances the granting of the off-sale license would adversely affect public welfare and morals was on this record peculiarly an issue for departmental resolution. It is lawful to sell,

possess and use intoxicating liquor in this state. Surely the board, which passes on the issuance of thousands of licenses under all conceivable conditions, can better determine the effect upon public welfare and morals of the granting of a license than can those who are not constantly so engaged. Undoubtedly, the protestants were completely and conscientiously serious in their objections and their witnesses were honestly apprehensive, as they said they were, that public welfare and morals would be adversely affected if Raley's application were granted, but the question was for resolution by the board and it cannot be said from this record that the board in anywise abused its discretion in granting the license.

 With respect to the contentions of respondent that the license could not be validly issued during the existence of a valid covenant against the sale of intoxicating liquors, the research of counsel and of the court has disclosed little authority, and apparently the question is novel in California. The Constitution, which vests in the department the exclusive power to license the sale of intoxicating liquor, makes the power subordinate to laws enacted by the Legislature. The Legislature, by section 23790 of the Alcoholic Beverage Control Act, has provided that retail licenses shall not be issued for any premises located in territory where the exercise of the rights conferred would be contrary to a valid zoning ordinance of any county or city unless the premises had been used in the exercise of such rights at a time prior to the effective date of the zoning ordinance. We find no other legislative enactment restricting the licensing power of the board. Restrictive covenants are private contracts as opposed to public zoning ordinances. In *Barnegat City Beach Assn.* v. *Busby,* 44 N.J. Law 627, the court said:

". . . The question of jurisdiction is not affected by the existence of covenants and conditions against open bars for the sale of intoxicating drinks, contained in the deeds for lands in this locality. However binding this may be upon the parties to such instruments, they are in no wise obligatory upon the court in the exercise of its statutory discretion to grant licenses for the public convenience, nor can such provisions render licenses granted invalid."

Apparently a contrary position has been taken by the courts in Pennsylvania. (See *Appeal of Cheris,* 127 Pa. Super. 355 [193 A. 162].)

 In this case the board received in evidence a certified copy of a deed imposing the restriction. From the record it

appears that the board considered the covenant to be valid and, further considering the covenant as one of the facts before it, specifically determined that its existence did not justify the board in a holding that its violation would be a matter affecting public welfare and morals. We think this conclusion of the board to have been warranted by the record before it. Apparently the board concluded that the covenant presented no insurmountable barrier to the granting of the license and left the parties to the covenant to resort to the courts if so advised. On this record this was a justifiable and proper disposition of the issue.

For the reasons given, the judgment appealed from is reversed.

Peek, J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 5, 1958.