[No. A059689. First Dist., Div. Two. Nov. 30, 1993.]

SEQUOYAH HILLS HOMEOWNERS ASSOCIATION, Plaintiff and Appellant, v.
CITY OF OAKLAND et al., Defendants and Respondents;
W.P.N. ASSOCIATES, Real Party in Interest.

**COUNSEL**

Joseph J. Kubancik and Zach Cowan for Plaintiff and Appellant.

Mark Wald, City Attorney, for Defendants and Respondents.

David A. Self for Real Party in Interest.

OPINION

PHELAN, J.—Appellant Sequoyah Hills Homeowners Association (appellant) timely appeals from denial of a petition for writ of mandate by which it sought to overturn a decision by respondent Oakland City Council to approve a housing development in the Oakland Hills. Appellant asserts that the environmental impact report (EIR)[1] and the findings underlying the city's approval of the project were inadequate under standards established by the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.) Appellant further contends that the project is inconsistent with the applicable general plan and, thus, violates the Subdivision Map Act. (Gov. Code, § 66410 et seq.) We granted the motion of the developer and real party in interest, W.P.N. Associates (WPN), to expedite this appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 1989, WPN filed its initial request for environmental review of a proposed project to develop a 10.1-acre parcel of land which slopes downhill from Skyline Boulevard in Oakland, just north of Keller Avenue. The land is zoned R-30, which allows up to 88 new lots on the site, barring physical site restraints. Rather than seek to build the full 88 units permitted by zoning regulations, WPN "pre-mitigated" the project by proposing to build only 46 homes. The project, "Oak Knoll Vista Estates" (the Oak Knoll project), was to abut the backyards of homes on Surrey Lane.

The proposed project and several of the alternatives considered by city officials included a plan to use a loop-road design to efficiently group the lots together, with approximately one quarter of the parcel alloted to a "conservation easement" to provide a "buffer of natural untouched land between the subdivision and its neighbors." This design was also intended to eliminate problems of having the project homes front directly on Skyline Boulevard, including traffic congestion that might otherwise result from homeowners backing their cars onto Skyline from their driveways. The stated objective of the project sponsor was to "develop a community of single-family residences which is compatible with surrounding land uses and

---

[1]The parties refer to a draft environmental impact report (DEIR), and a final environmental impact report (FEIR). In fact, the FEIR consists of the DEIR (or revision thereof), along with comments and recommendations received on the DEIR, a list of persons commenting on the DEIR, responses of the lead agency to the significant environmental points raised by the comments, and any other information added by the lead agency. (Guidelines for Implementation of the California Environmental Quality Act, Cal. Code Regs., tit. 14 [hereafter Guidelines], § 15132.)

which optimize [*sic*] the scenic and topographic features of the site," which would also be "the least expensive single-family housing for the vicinity."

On March 1, 1990, the city planning department informed WPN that an EIR would be required for the proposed project. The DEIR was prepared and submitted to the planning department in December 1990. The DEIR thoroughly analyzed the project proposal and identified several significant adverse environmental impacts that would result from the development, all but one of which could be avoided or mitigated to a level below significance. As to that impact, on "visual resources and visual quality," the DEIR states that "the visual quality would be significantly affected by any substantial development," and that "[s]ome visual impact is unavoidable." However, the DEIR also analyzed the problem thoroughly and concluded that architectural and site design elements, as well as sensitive materials selection, could be relied upon to substantially reduce many of the visual impacts.

The DEIR also included discussion of several project alternatives, including: (1) a no-project alternative; (2) an increased density alternative, under which 63 duet dwellings would be built on the site; (3) a mitigated alternative, under which 45 homes would be built, the conservation easement widened, an emergency access road installed, and a variety of architectural design changes and landscaping techniques utilized to mitigate the visual impacts of the project; and (4) a decreased density alternative under which 36 units would be built on wider lots that would decrease the need for grading and improve emergency access, but as to which the "visual impacts would be similar to the proposed project." After stating that the developer had rejected the decreased density alternative because the houses would necessarily be more expensive than those of the proposed project, the DEIR declares that the mitigated alternative would be "environmentally superior" to the proposed project because "significant and unavoidable impacts to visual resources and visual quality are reduced as much as may be possible at the project density."

The Oakland Planning Commission held five public hearings to receive comments on the project during the period from January through June 1991. The FEIR, which was completed by April 15, 1991, incorporates many of those comments and the city's responses to the significant environmental points raised thereby. As is obvious from the DEIR and FEIR, and the transcripts of the planning commission hearings, the range of comments received was voluminous. Notably, the planning commission had extensive input from the opponents of the proposed project, especially those homeowners residing on Surrey Lane immediately adjacent to the project site.

After considering the information presented, the planning commission voted on June 26, 1991, to certify the FEIR as having been completed in accordance with CEQA, and to adopt the recommendations and findings contained in the staff report of the same date. Among the commission's findings were the following: (1) specific mitigation measures should be required as conditions of approval of the project; (2) the identified mitigation measures would avoid (or mitigate to levels below significance) all of the significant environmental effects identified in the FEIR, except the unavoidable visual impact associated with the project; (3) the only way the visual impact could be significantly reduced would be to "substantially reduce" the number of proposed lots; and (4) the benefits of the proposed project outweigh the unavoidable adverse environmental impact in that the project "will promote the City's efforts to increase the supply of housing available in the City while continuing to support careful residential land development in the Oakland Hills area."

After a lengthy debate about proposals for reducing the number of lots to address the neighbors' continuing concerns about drainage and visual impact, the planning commission also voted to recommend approval of the subdivision map application for a tract including 45 lots. In this regard, the planning commission made findings, as required by the Subdivision Map Act, as follows: (1) the project is consistent with the density permitted by zoning regulations; (2) the project density (1 unit per 9,796 square feet of land) exceeds the density designated for the area (1 unit per 10,000+ square feet of land) in the "Illustrative Future Land Use" map contained in the Oakland Comprehensive Plan (OCP);[2] (3) nevertheless, the project density is "appropriate" under OCP policies, which provide that the land use classifications are flexible and that the city will prefer a relatively higher density for a given project where certain conditions are met; and (4) all of the relevant conditions are met in this case. Accordingly, the planning commission recommended approval (under specified conditions) of a tentative map for the 45-unit "mitigated alternative" described in the EIR.

Appellant sought review of the planning commission's decision by taking an appeal to the city council. The city council held four more public hearings between September 15 and December 17, 1991. On that latter date, the city council voted to sustain, and incorporated by reference, the decision of the planning commission. The city council also specifically found that the project was in compliance with the applicable general plan, zoning, and development policies of the City of Oakland, and that there would be no

---

[2]The OCP consists of several documents, including the Oakland Policy Plan (OPP) and the Land Use Element of the Comprehensive Plan (LUE).

adverse impact on public health or safety if the project were approved under the specified conditions. Accordingly, the city council determined that Government Code section 65589.5, subdivision (j), prevented it from requiring the developer to lower the project density.

On February 13, 1992, appellant filed a petition for writ of mandate and complaint for injunctive relief, seeking to overturn the city council's decision. After considering exhaustive briefing and oral argument in connection with the petition, the superior court denied appellant's petition and entered judgment in favor of the city and WPN on September 14, 1992. This appeal followed.

DISCUSSION

A. *The EIR and the City's Findings in Support of the Oak Knoll Project Were Adequate to Satisfy CEQA Standards.*

■ In reviewing the city council's actions under CEQA, both the trial court and this court look to Public Resources Code section 21168.5, which provides that our inquiry "shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161] [*Goleta II*].) Our inquiry into the adequacy of the EIR is governed by the same abuse of discretion standard. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66].) It is not our function to pass on the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. (*Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 673 [188 Cal.Rptr. 233].) We look "not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)

1. *The Oak Knoll EIR Considered a Reasonable Range of Alternatives.*

Under the plan approved by the city council, the impact on *visual* resources is the only identified environmental impact of the Oak Knoll project which is not mitigated below the level of significance. As defined in the EIR, "Visual resources and visual quality are terms used to describe human perceptions of combining form, bulk, scale, texture, color, and viewing range of a site, relative to the context of its locale. Such perceptions are

difficult to quantify and are essentially subjective in scope." Nevertheless, the EIR recognizes that "project impacts to visual conditions are important environmental concerns[] subject to CEQA assessment."

■ Appellant contends that the EIR was inadequate because it failed to articulate a "decreased density alternative" which actually addressed the project's visual impact. Respondents counter that the EIR is adequate under CEQA standards in that it analyzed a reasonable range of project alternatives which are both feasible and capable of offering substantial environmental advantages over the original project proposal. We believe the respondents have the better of this argument.

The California Supreme Court recently reaffirmed that ". . . an EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, or to the location of the project, which: (1) offer *substantial* environmental advantages over the project proposal (Pub. Resources Code, § 21002); and (2) may be 'feasibly accomplished in a successful manner' considering the economic, environmental, social and technological factors involved. (Pub. Resources Code, § 21061.1; Guidelines, § 15364; [*Citizens of Goleta Valley* v. *Board of Supervisors* (1988)] 197 Cal.App.3d 1167 [243 Cal.Rptr. 339] [*Goleta I*].)" (*Goleta II, supra*, 52 Cal.3d at p. 566, original italics deleted, italics added.) The treatment of alternatives in the Oak Knoll project was adequate under this standard.

The Oak Knoll EIR provides a rather detailed analysis of the visual impacts of the original project proposal from a variety of vantage points. The EIR notes that the project would stand out because of its relatively higher density and its location on a prominent hillside overlooking the existing residential development. Other adverse visual impacts were attributed to the "row-like" appearance of portions of the development and the fact that a few of the homes seemed to "jut above the ridgeline," at least from some perspectives.

The EIR also analyzes two alternatives to the original proposal, each of which would provide some relief from the project's visual impacts. Although it is almost as dense as the project originally proposed, the 45-unit "mitigated alternative" utilizes a significantly modified site plan and a variety of design elements to help break up the "row-like" appearance, lower the "jutting" roof lines, and generally heighten the overall visual interest of the project. The mitigated alternative also provides for a wider conservation easement to set the project homes further back from the rear property lines of the Surrey Lane homes. Additionally, the EIR notes that selection of

appropriate landscaping and building materials would help the project blend with the natural landscape. Although the net result of these measures is a "visually attractive residential development at the project density," one which is "environmentally superior" to the original project proposal, the EIR concludes that the mitigated alternative would still have a substantial impact on visual conditions for neighbors of the project on Surrey Lane and in other adjoining areas. Similarly, the 36-unit "decreased density alternative" discussed in the EIR would enlarge the conservation easement, reduce the overall bulk of the project and, thereby, help overcome the visual impacts on residences in the Surrey and Keller Lane areas. However, this alternative would have a visual impact "similar" to that of the project as originally proposed.

Appellant contends that, upon finding a significant visual impact from the mitigated and 36-unit alternatives, the EIR should have examined additional "decreased density alternatives." We agree with respondents that this was not required by CEQA and likely would have been an exercise in futility. The EIR concluded that "any substantial development" of the project site would have a significant visual impact, and that some visual impact is "unavoidable." Further, the EIR determined that, from the perspective of local residents and passers-by, "new development of a major portion of the site *at any density* would unavoidably affect the existing open space visual character of the site vicinity." (Italics added.) Thus, even if the EIR had examined the additional alternatives proposed by appellant (e.g., a 23-unit or a 10-unit project) it would not eliminate the significant visual impacts from the project. Plainly, the EIR was not required to analyze every possible lower-density alternative that was or might have been proposed. (See *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1028-1029 [185 Cal.Rptr. 41].) As in *Village Laguna,* we conclude that the EIR evaluation of plans for development of 0, 36, 45, 46 and 63 units at the Oak Knoll site was "sufficient to satisfy the informational goal of CEQA." (134 Cal.App.3d at p. 1028.)

 2. *The City Council Did Not Abuse Its Discretion by Rejecting a Decreased Density Alternative on the Grounds of Infeasibility.*

 ■■ ■■ ■■ ■ Appellants next contend that there is not substantial evidence to support the city council's finding that the 36-unit alternative and, by implication, any other decreased density alternative would not be

feasible.[3] CEQA does not require extended consideration of project alternatives that are not "feasible." (*Goleta II, supra,* 52 Cal.3d at p. 566.) In fact, it permits public agencies to approve projects for which significant environmental impacts have been identified upon a finding that "economic, social, or other considerations" render such alternatives infeasible. (Pub. Resources Code, § 21081, subd. (c).) As defined in the CEQA Guidelines, " 'Feasible' means capable of being accomplished in a successful manner within a reasonable period of time, taking into account *economic,* environmental, *legal,* social and technological factors." (Guidelines, § 15364, italics added.) The EIR discusses the concept of economic feasibility, but only indirectly, by incorporating the project sponsor's comments that—based on its market surveys—it had rejected the concept of a lower-density project "because the houses would be necessarily more expensive than those of the proposed project," and would defeat the project objective of providing the "the least expensive single-family housing for the vicinity." The city council accepted WPN's evidence that a decreased density alternative was economically infeasible, but also found that requiring a decrease in project density would be *legally* infeasible in that it would be prohibited by Government Code section 65589.5, subdivision (j).

In relevant part, that section provides: "When a proposed housing development project complies with the applicable general plan, zoning, and development policies," a local agency may not require as a condition of approval that the project be developed at a lower density, unless the project "would have a specific, adverse impact upon the public health or safety" that cannot be mitigated without lowering the density. (Gov. Code, § 65589.5, subd. (j)(1).) As respondents argue, this enactment is not a legislative will-o'-the-wisp. Rather, it is based on a legislative finding that "The lack of affordable housing is a critical problem which threatens the economic, environmental, and social quality of life in California." (Gov. Code, § 65589.5, subd. (a)(1).)

In this case, the city council found that the Oak Knoll project complied with all general plan, zoning, and development policies. As discussed in part B, *post,* we believe that these findings are supported by substantial evidence.

---

[3]Appellant also appears to argue that the EIR did not adequately address the issue of economic feasibility of the alternatives to the proposed project. While economic information about a given project may be included in an EIR, it is not required. (Guidelines, § 15131.) Although the ultimate decisionmaker is required to consider economic and social factors in making its feasibility findings, the agency may receive such information in whatever form it desires. (*Ibid.*) If the decisionmaker is correct in finding that a given alternative is infeasible, the EIR will not be deemed inadequate simply because it failed to include an analysis of that alternative. (*Goleta II, supra,* 52 Cal.3d at p. 566.)

Thus, the only way appellant can avoid the impact of section 65589.5, subdivision (j)(1), is by establishing that the project, at the approved density, will have a "specific, adverse impact upon the public health or safety." This they cannot do. There is no evidence to support such a conclusion, and the city specifically found that no such impact would result from the project. We conclude that the city did not abuse its discretion when it found that any decreased density alternative would be legally infeasible and approved the mitigated alternative.

> 3. *The City Council's Findings as to Cumulative Visual Impact and Change in Land Use Were Adequate.*

Appellant's final contention as to CEQA compliance is that the city did not make adequate findings on the issues of "cumulative visual impact" and "change in land use," two impacts identified in the EIR. As originally described in the DEIR, the cumulative visual impact was described by the very general proposition that the Oak Knoll project would "diminish the amount of existing open space" and, when added to existing and nonspecific future development, would produce a "change to a more urban quality" in the area. When the FEIR was prepared, this impact was described as "significant," but only to the extent the Oak Knoll project would combine with a proposed development in the Dunsmuir Heights area.

We agree with respondents that it is reasonable to infer the city council addressed both the individual *and* cumulative visual impacts of the Oak Knoll project when it found that "any development on the site[] would also unavoidably affect visual resources." The city council also found that the adverse impact on visual resources was outweighed by the benefits to be gained by approving the project at the proposed density to increase the supply of available housing in the city. Those findings, plus the city's finding that the decreased density alternative would be legally infeasible, were sufficient to satisfy CEQA (Pub. Resources Code, § 21081) and its implementing regulations (Guidelines, §§ 15091, 15093).[4]

The change in land use from open space to residential was described in the EIR as one of the "Unavoidable Adverse Impacts If the Project is Implemented." However, as explained by the author of the EIR, Mr. Paul Cogley, this is not a "significant environmental effect" for which a specific finding is

---

[4]We also agree with respondents that, even if the city council's finding on cumulative visual impact was inadequate, it would be an idle act to order the city to revisit this issue now that the Dunsmuir Heights project has been disapproved. In this regard, we grant respondent's request to take judicial notice of the resolution denying the application for development of Dunsmuir Heights.

required. (Pub. Resources Code, § 21081; Guidelines, § 15091.) Even if it were, however, we believe that the city council's findings were adequate. The only way to have avoided or mitigated the loss of open space at the Oak Knoll site would have been to drastically reduce the density of the project, i.e., to disallow *any* substantial residential development. As we have already discussed, Government Code section 65589.5 prevented the city council from requiring a reduction in the density of the project.

B. *The Oakland City Council Did Not Abuse Its Discretion by Concluding That the Oak Knoll Project Is Consistent With the City's Applicable General Plan.*

■ Appellant next contends that the Oak Knoll project conflicts with certain provisions of the OCP, and should not have been approved. (Gov. Code, §§ 66473.5, 66474.) The city council's determination that the Oak Knoll project is consistent with the OCP comes to this court with a strong presumption of regularity. (See *California Manufacturers Assn.* v. *Industrial Welfare Com.* (1980) 109 Cal.App.3d 95, 106 [167 Cal.Rptr. 203].) To overcome that presumption, an abuse of discretion must be shown. (Code Civ. Proc., § 1094.5; *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 651, fn. 2 [150 Cal.Rptr. 242, 586 P.2d 556].) An abuse of discretion is established only if the city council has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subd. (b).) We may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body. (*Board of Trustees* v. *Munro* (1958) 163 Cal.App.2d 440, 445 [329 P.2d 765].)

1. *The City Council Did Not Abuse Its Discretion by Concluding That the Project Is Consistent With the Land-use Designation for the Oak Knoll Site.*

■ Appellant first argues that the Oak Knoll project is inconsistent with the OCP in that it does not conform precisely with the land use designation for the site. We reject this argument. In the first place, state law does not require an exact match between a proposed subdivision and the applicable general plan. (*Greenebaum* v. *City of Los Angeles* (1984) 153 Cal.App.3d 391, 406-407 [200 Cal.Rptr. 237].)[5] Rather, to be "consistent," the subdivision map must be "compatible with the objectives, policies, general

[5]Appellant's reliance on *deBottari* v. *City Council* (1985) 171 Cal.App.3d 1204 [217 Cal.Rptr. 790], is misplaced. *deBottari* dealt with zoning consistency, not the Subdivision Map Act, and involved an attempt by a citizens' group to place a referendum before the voters to repeal a rezoning ordinance passed by the city council. In that case, the court refused to

land uses, and programs specified in" the applicable plan. (Gov. Code, § 66473.5.) As interpreted, this provision means that a subdivision map must be "in agreement or harmony with" the applicable plan. (*Greenebaum, supra,* 153 Cal.App.3d at p. 406; 59 Ops.Cal.Atty.Gen. 129, 131 (1976); see also 67 Ops.Cal.Atty.Gen. 75 (1984).)

Here the applicable plan provides that "[w]ithin most built-up residential areas, the density of new housing should in general not *greatly exceed* the area's existing density." (Italics added.) Accepting appellant's calculations of the density at 8,074 square feet per unit,[6] the Oak Knoll project would be in line with other recent residential development in the area.

Appellant nevertheless contends that the project is inconsistent with the OCP because it exceeds the density specified in an "Illustrative Future Land Use Map" (the Map) contained in the OCP. By its own terms, the OCP confers upon city officials some discretion to diverge from the details of the Map, so long as the variation serves the plan's policies and objectives as well or better. The Map merely "indicates in its broad configurations, *but only tentatively in its details*, the planned predominant land uses. Variation from the details is appropriate where it is demonstrated that this would serve the Comprehensive Plan's written goals and policies just as well or better." (Italics added.) Another part of the OCP, the LUE, emphasizes this point: "[T]he details on [the Map] are largely illustrative in nature, and closer studies may show that Plan goals and policies justify some variations from those details."[7]

We believe the proceedings in the planning commission and city council, as required by CEQA and the Subdivision Map Act, were such "closer

overturn the city council's decision that the referendum would result in enactment of a zoning ordinance which would be "clearly" inconsistent with the recently amended general plan. (*Id.* at pp. 1210-1213.) In this respect, *deBottari* supports the view that we defer to the Oakland City Council's consistency findings. (*Ibid.*)

[6]Based on its own calculations and interpretation of OCP methodology, appellant asserts that the OCP designates the Oak Knoll site for a maximum of 36 units and that the density of the approved project (1 unit per 8,075 square feet of land) exceeds that designated in the OCP (1 unit per 10,000 or more square feet). In its brief, respondent does not seriously dispute this point. However, the record of the proceedings below indicates that the city planning commission came to a different conclusion. In its staff report, the commission appears to have calculated the density of the project as originally proposed (with 46 units) as 1 unit per 9,796 square feet of land. In light of our conclusion that the city council did not abuse its discretion in finding the approved project to be consistent with the OCP, this factual dispute is not material to our analysis.

[7]In this regard, we agree with respondents that the LUE complies with Government Code section 65302. That section requires a "statement of the standards of population density and building intensity *recommended* for the various districts . . . covered by the plan." (Italics added.)

studies" showing that variation from the details of the OCP is warranted for the Oak Knoll project. After consideration of all the information presented in those proceedings—including information contained in the EIR, expressions of concern about pressing housing needs in Oakland, and the views of the affected neighbors—it was well within the city council's discretion to find that the project density (i.e., that of the mitigated alternative) was consistent with the land use designation in the OCP.

### 2. *The City Council Did Not Abuse Its Discretion by Concluding That the Project Is Consistent With Applicable OCP Policies.*

██ Finally, appellant argues that the Oak Knoll project should not have been approved because there is some evidence that it conflicts with three OCP policies encouraging development which is sensitive to natural land forms, and the natural and built environment. Respondents acknowledge the existence of this evidence, which includes an opinion by the city's EIR consultant that removal of a knoll on the site, and development on slopes of greater than 30 percent (on lots 16, 17, and 18 only), conflict with the three policy statements on which appellant relies. Respondents note, however, that appellant conveniently overlooks the substantial body of evidence that the Oak Knoll project would be *fully* consistent with at least 14 of the 17 OCP policies which were deemed pertinent; they also point to evidence that the project would even be consistent, in most respects, with the 3 policies on which appellant relies.

Respondents also argue that none of the policies on which appellant relies is mandatory, and that a given project need not be in perfect conformity with each and every OCP policy. We agree. Indeed, it is beyond cavil that no project could completely satisfy every policy stated in the OCP, and that state law does not impose such a requirement. (*Greenebaum* v. *City of Los Angeles, supra,* 153 Cal.App.3d at pp. 406-407; 59 Ops.Cal.Atty.Gen., *supra,* 129, 131.) ██ A general plan must try to accommodate a wide range of competing interests—including those of developers, neighboring homeowners, prospective homebuyers, environmentalists, current and prospective business owners, jobseekers, taxpayers, and providers and recipients of all types of city-provided services—and to present a clear and comprehensive set of principles to guide development decisions. Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be "in harmony" with the policies stated in the plan. (*Greenebaum, supra,* 153 Cal.App.3d at p. 406.) It is, emphatically, *not* the role of the courts to micromanage these development decisions. Our function is simply to decide

whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those find ings are suppor ted by substantial evidence. (Code Civ. Proc., § 1094.5; *Young-blood* v. *Board of Supervisors, supra,* 22 Cal.3d 644, 651.)

 In this case, there is no question that the city thoroughly evaluated the Oak Knoll project in light of relevant OCP planning policies, and made a finding (and incorporated, by reference, the findings of the planning commission) that the project is consistent with those policies. The only real issue is whether substantial evidence supports that conclusion. It does. The EIR contains a detailed discussion of evidence of consistency with pertinent OCP policies on housing, land use, residential uses, open space and natural resources, earth resources, water resources, plant and animal resources, safety and seismic safety, and scenic highways. As to the three "Land Use" policies on which appellant relies, there is conflicting evidence. On the one hand, the EIR states that the prominent visibility of the project, removal of the knoll, and development of lots 16, 17, and 18 conflict with portions of those Land Use policies favoring development which is sensitive and har-monious with the natural setting, and avoids significant alteration of natural land forms. On the other hand, the EIR states that the Oak Knoll project is consistent with these same policies in that it would minimize grading, avoid encroachment on natural drainage, provide a conservation easement on three sides of the property, avoid "cut and fill" techniques for creating building pads, protect most of the 30+ percent slopes by including them within the conservation easement and replanting those slopes where development will occur, and use landscaping to help the project blend into the natural and built environment. We will not reweigh this evidence. (*Board of Trustees* v. *Munro, supra,* 163 Cal.App.2d at p. 445.) We conclude that the city council did not abuse its discretion by evaluating the Oak Knoll project under the competing policies of the OCP and deciding, after weighing all the evidence, that the project was generally consistent with applicable OCP policies.

## CONCLUSION

For all of the foregoing reasons, we affirm the trial court's decision denying appellant's petition for writ of mandate.

Kline, P. J., and Benson, J., concurred.