Filed 2/20/14  Naples Coalition v. County of Santa Barbara CA2/6

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| NAPLES COALITION et al., <br><br> Petitioners and Appellants, <br><br> v. <br><br> COUNTY OF SANTA BARBARA et al., <br><br> Respondents, <br><br> SANTA BARBARA RANCH LLC et al., <br><br> Real Parties in Interest. | 2d Civil No. B245728 <br> (Super. Ct. No. 1304044) <br> (Santa Barbara County) <br><br> MODIFICATION OF OPINION <br> ON DENIALOF REHEARING <br> (No Change in Judgment) |

THE COURT:

On Page 13 before the second to last paragraph beginning with the words "Appellants' remaining arguments" insert the following:

`    *Government Code Section 65300.5*

Appellants, in their petition for rehearing, argue that the project violates state planning law which requires that project-specific land use and development policies be consistent and compatible with the general plan.  (Gov. Code, § 65300.5; *Federation of Hillside and Canyon Associations v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195; *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 704.)  Here the

evidence supports the finding that the Naples development policies are in the public interest and consistent with the general plan. (Gov. Code, § 65358; *Woodward Park Homeowners Ass'n, Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 706 [applying deferential standard of review to Gov. Code, § 65300.5 claim that project was inconsistent with general plan].) A consistency finding requires that the proposed project be compatible with the objectives, policies, general land uses, and programs specified in the general plan. (Gov. Code, § 66473.5; *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678.) The Naples project, as approved, satisfies those criteria. Appellants make no showing that County's consistency findings are without evidentiary support or so arbitrary that it "gives the developer an unacceptable freebie." (*Endangered Habitats League, Inc. v . City of Orange* (2005) 131 Cal.App.4th 777, 789.)

The petition for rehearing is denied.

No Change in Judgment.

Filed 1/28/14 (unmodified version)
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.111.5.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| NAPLES COALITION et al.,<br><br>        Petitioners and Appellants,<br><br>v.<br><br>COUNTY OF SANTA BARBARA et al.,<br><br>        Respondents,<br><br>SANTA BARBARA RANCH LLC et al.,<br><br>        Real Parties in Interest. | 2d Civil No. B245728<br>(Super. Ct. No. 1304044)<br>(Santa Barbara County) |

Naples Coalition, Environmental Defense Center, and Surfrider Foundation appeal the denial of their mandamus petition to set aside Santa Barbara County Board of Supervisors' (County) approval of the Santa Barbara Ranch Development Project (project) and certification of the revised final environmental impact report (FEIR). The trial court concluded that the project did not violate the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and that substantial evidence supported the finding that the project was consistent with applicable policies and development standards in the Santa Barbara County Land Use and Development Code. We affirm.

*Facts & Procedural History*

Appellants challenge the issuance of development permits for the project, a residential development on the Gaviota Coast, two miles west of the City of Goleta. The property is owned by real party in interest Santa Barbara Ranch LLC (SBR). Real parties in interest James H. Franzen, Stephen R. Welch, and Howard M. Simon, Trustees of the Rudolph Schulte Trust U/A/D 3/22/91, (also referred to as "Shulte Trust" or "Dos Publos Ranch Real Parties") own the adjoining Dos Pueblos Ranch.

. County approved the project on October 21, 2008, after decades of litigation over the development of Town of Naples. Before that date, there was a long-standing inconsistency between the Santa Barbara County Comprehensive Plan which allowed one residential unit for every 100 acres in rural agricultural areas (AG-II-100) and the Official Map of the Town of Naples which divided the property into 274 lots, most of which were eligible for single family residence development under the County Land Use and Development Code (LUDC).[1] The Naples Townsite was designated a "Special Problems Area" for planning purposes due to the high density of legal lots in a rural area and other environmental concerns.

Santa Barbara County Local Coastal Plan Policy 2-13 provided that "County shall discourage residential development of existing lots. The County shall encourage and assist the property owner(s) in transferring development rights from the Naples townsite to an appropriate site within a designated urban area which is suitable for residential development. If the County determines that transferring development rights is not feasible, the land use designation of AG-II-100 should be re-evaluated." (Italics omitted.) County conducted a Transfer of Development Rights Study and determined

---

[1] In *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725 our Supreme Court invalidated County ordinances requiring the merger of the Naples lots as a prerequisite to development permits. In 1995, County adopted the "Official Map of the Town of Naples" which shows 274 legal lots. The SBR property includes 219 Naples lots on 485 acres.

that some of the development rights could be transferred but would not reduce densities enough, thereby justifying a new land use and zoning designation.

In 2000 County entered into negotiations to reduce the number of buildable lots in exchange for SBR's relinquishment of certain developmental rights. During the negotiations, SBR acquired 560 acres of adjacent property known as North Dos Pueblos Ranch. Several project plans were considered, including a 54-unit project (the MOU Project) and a 72-unit project (Alternative 1) on the SBR and North Dos Pueblos Ranch properties.

Alternative 1 included most of the Naples Townsite (219 legal non-conforming lots) and relocated much of the development to the north side of Highway 101, reducing the number of residential lots on the coast side of the highway. Alternative 1 required that SBR and North Dos Pueblos Ranch relinquish 176 lots and that North Dos Pueblos Ranch establish a 2,600+ acre agricultural preserve. The Alternative 1 proposal provided for the creation of a new Naples Planned Development District (NPD) and the creation of NPD land use and zoning designations that would limit development and implement a land use policy more protective of coastal resources.

The EIR was circulated for comment in 2006 and recirculated in 2007. In response to comments on the recirculated EIR, SBR agreed to modify Alternative 1 by moving more of the development inland (Alternative 1B), reducing the total number of residential lots from 72 to 71. Alternative 1B had 22 lots on the ocean side of Highway 101 (coastal lots) and 49 lots on the north side of Highway 101 (inland lots) but five of the inland lots, if developed, could have rooflines protruding into the skyline. County compared Alternative 1B to Alternative 1 and concluded that Alternative 1B would not result in new or substantially more environmental impacts or require a new environmental impact report.

On October 21, 2008, County approved Alternative 1B and certified the revised Final Environmental Impact Report (FEIR). County also added site specific provisions to the County Comprehensive Plan and Land Use and Development Code, authorizing higher densities and flexible development standards in exchange for

landowners' relinquishment of the right to develop 80 percent of the Naples lots.  The County Board of Supervisors found that Alternative 1B was part of a global solution to long-standing Naples land use disputes and competing agriculture, open space, recreation, and coastal resource concerns.  It further found that the project was consistent with the California Coastal Act, the Coastal Land Use Plan, and the County Comprehensive Plan.[2]

Appellants filed a mandamus petition to set aside County's approval of the Alternative 1B project and certification of the FEIR.  The trial court, in a 32-page decision, denied the writ petition.[3]

### Standard of Review

We do not pass upon the correctness of the FEIR's environmental conclusions but only upon its sufficiency as an informative document. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392.) Where an EIR is challenged as being legally inadequate, the court presumes that the agency's decision to certify the EIR is correct and the burden is on the party challenging it to show otherwise.  (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.) "In reviewing an EIR, we focus on adequacy, completeness, and a good faith effort at full

---

[2] The FEIR states that the project "entails the development of 71 new residential dwellings,  equestrian center, agricultural support facilities, a worker duplex, public amenities (including access road, parking and restroom, wildlife interpretive kiosk and coastal access trails), and creation of conservation easements for permanent protection of open space and agriculture.  The Project site encompasses the Santa Barbara Ranch and the Dos Pueblos Ranch, together totaling 3,249 acres and 85% of the lots comprising the Official Map of Naples Townsite."

[3] Appellant dismissed their claims concerning approval of the 22 coastal lots ("Coastal Approvals" - also referred to as the "Coastal Project") and limited the mandamus action to approval to the 49 inland lots (referred to as the "Inland Project").   As we shall discuss, CEQA review of the entire project (both the Coastal Project and Inland Project), the creation/implementation of the Naples Townsite Designation, and the amendment of the Santa Barbara County Land Use and Development Code required County to resolve overlapping and conflicting policies  concerning coastal land use and density, the conversion of agricultural land to non-agricultural uses, and the protection of coastal and visual resources.

disclosure. [Citation.]" (*Santa Monica Baykeeper v. City of Malibu* (2011) 193 Cal.App.4th 1538, 1547.)

*Environmental Baseline*

Appellants argue that the FEIR is flawed because it uses a Grid Development build-out of the Naples Official Map lots as the environmental baseline. CEQA Guidelines require that the FEIR describe the existing environment, i.e. the actual physical conditions. (Cal. Code of Regs., tit. 14, § 15125, subd. (a); Guidelines, *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 119-120.) " '[I]n assessing the impacts of a project proposed for an undeveloped piece of property, agencies should compare project impacts against the *existing environment,* rather than some hypothetical, impacted future environment that might occur without the project under existing general plan and/or zoning designations.' [Citation.]" (*Woodward Park Homeowners Assn, Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 709-710.)

County argues that appellants did not raise the baseline issue at the administrative hearings or in the writ petition and are precluded from asserting it on appeal. (See e.g., *Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 737.) Waiver aside, the question of whether County complied with CEQA before approving a major development project may be raised for first time on appeal as an issue of public interest. (*Woodward Park Homeowners Assn. Inc. v. City of Fresno, supra,* 150 Cal.App.4th at p. 714.)

The FEIR describes the current existing conditions. Section 9.0 of the FEIR, which spans hundreds of pages, sets forth the existing environmental conditions including geology (Section 9.2), hydrology (Section 9.3), biological resources (Section 9.4), hazards and hazardous material (Section 9.5), land uses, designations, and zoning (Section 9.6), agricultural resources (Section 9.7), mineral resources (Section 9.8), visual resources (Section 9.9), recreation (Section 9-10), cultural resources (Section 9.11), traffic and circulation (Section 9.12), noise (Section 9.14), air quality (Section 9.14), public services and infrastructure (Section 9.15), and global climate change (Section

9.16).  Section 9.6.2.2 of the FEIR states that the full extinguishment of development rights is not feasible  and discusses the creation of a new Naples Planned Development District (NPD) "to achieve a balance that provides for low density residential units, public access and recreation opportunities, preservation of the scenic and rural character of the Naples area, conservation of open space and biological resources, and [uses that are compatible] with the surrounding  agricultural uses of the Gaviota Coast."  (Italics omitted.)  Under the heading "Land Use," section 9.6 of the FEIR states that Alternative 1B would not result in a significant impact because the total number of homes is small and the development footprint would be small relative to the size of the southern Gaviota Coast (40,000 acres).

The FEIR not only describes the environmental baseline but considers six project alternatives.  Appellants take issue with Alternative 3A which is set forth in Section 10.0 of the FEIR as the "**No Project with Grid Development**" scenario.  This was provided for informational purposes and is required by CEQA.  (Guidelines, § 15126.6., subd. (e)(1).)  "The purpose of describing and analyzing a no project alternative is to allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project.  The no project alternative analysis is not the baseline for determining whether the proposed project's environmental impacts may be significant, unless it is identical to the existing environmental setting analysis which does not establish the baseline (see Section 15125)." (*Ibid.*)

The no project Grid Development scenario identifies project inconsistencies and explains why the Naples Townsite is a "Special Problems Area."  The specter of 274 legal nonconforming lots must be, and has been, considered by the trial court and on appeal.  CEQA requires that the project be measured against the " 'real conditions on the ground.' [Citations.]"  (*Save our Peninsula Committee v. Monterey County Bd of Supervisors* (2001) 87 Cal.App.4th 99, 121.)  "Neither CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for the determination of the existing conditions baseline.  Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be

measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence. [Citation.]"  (*Communities for a Better Environment v. South Coast Air Quality Dist.* (2010) 48 Cal.4th 310, 328.)

Read as a whole, the FEIR sets forth the environmental setting and uses it as a baseline to compare project impacts with existing conditions. Appellants make no showing that the FEIR is misleading, lacks informational value, or that the no-project Grid Development alternative scenario misled the public and decision makers about the project's likely adverse impacts.  (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

*Project Inconsistencies With General Plan*

CEQA requires that the FEIR discuss inconsistencies between the proposed project and applicable general and regional plans.  (Guidelines, § 15125, subd. (d).) Appellants argue that the project is inconsistent with the County Land Use and Development Code (LUDC) which limits urban development and prohibits development that intrudes into the skyline.  On review, "we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it.  [Citation.]"  (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.)

Appellants assert that the project must strictly comply with all applicable policies set forth in the LUDC without exception.[4]  We reject the argument because the County Comprehensive Plan sits atop the hierarchy of local government laws regulating land use and development.  (Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2013) § 20.2, p. 940.)  "The general plan is the charter to which the [zoning

---

[4] The LUDC provides that conditional use permits and final development plans require a finding that "[t]he proposed project will comply with all applicable requirements of this Development Code . . . ."  (Santa Barbara County Code, chpt. 35, § 3582.060.E.1.f; 35.82.080.E.1.f.)  Under the heading "**Rules of Interpretation**," the LUDC states:  "When used in this Development Code, the words 'shall,' 'must', [and] 'will' . . . are always mandatory."  (Santa Barbara County Code, ch. 35.12, § 35.12.030.A.)

and development code] must conform." (*Lesher Communications v. City of Walnut Creek* (1990) 52 Cal.3d 531, 541.)  Stated another way, zoning laws and county land use and development policies must be consistent with the general plan.  (Gov. Code, § 65860.) "The tail [i.e., a LUDC policy] does not wag the dog [i.e., the Comprehensive General Plan]."  (*Lesher Communications v. City of Walnut Creek, supra,* 52 Cal.3d at p. 541.)

*Land Use Development Policy 3 - Urban Development in Rural Areas*

Land Use Development Policy 3 provides that "[n]o urban development shall be permitted beyond boundaries of land designated for urban uses except in neighborhoods in rural areas."  The Comprehensive General Plan Land Use Element defines "Urban Development" as "Residential development at a density higher than 0.2 unit per gross acre (one unit per five gross acres)" or "[t]he creation by land division or lot line adjustment of any parcel(s) smaller than five acres in gross area."

Appellants complain that nine of the seventy-one project lots are smaller than five acres.  County found that the project is not urban development because the project's average lot size would be 13+ acres.  Appellants argue that average lot size is not a valid consideration --- Land Use Development Policy 3 requires that each lot be a minimum of five acres.  An EIR, however, may consider project alternatives that require a site-specific amendment of the general plan.  (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 573.)  That is what happened here.

Concurrent with project approval, County amended the Land Use Element to add the Naples Townsite Designation (NPD) and change the AG-11-100 rural agricultural designation.  County adopted Ordinance No. 4692 which amends the LUDC to make the Naples Townsite a Special Purpose Zone (NTS Zone).  It adopted a new Naples Townsite Policy 6(e) which provides:  "Development within the Naples Townsite designation shall incorporate design flexibility in the siting of dwellings and other development features in order to minimize the disturbance of rural landscape elements, habitat areas, scenic quality, and overall aesthetic value of the landscape."  Section 35.6.060.B was added to the LUDC as a new NTS Zone standard which provides:  "No

minimum lot size is required; however, structures and site improvements shall be confined to development envelopes . . . ."

County found that the NTS Zone, which has no minimum lot size requirement, is consistent with all comprehensive plan policies.[5] It did nor err. " 'Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role "is simply to decide whether [County] considered the applicable policies and the extent to which the proposed project conforms with those policies." [Citation.]' [Citation.]" (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco,* (2002) 102 Cal.App.4th 656, 677.)

The Naples Townsite is unique because it is divided by Highway 101 with the coastal lots subject to Coastal Land Use plan (CLUP) and the inland lots subject to the County Comprehensive Plan. There are overlapping and conflicting policies regarding land use density, conversion of agricultural land to non-agricultural uses, and the protection of coastal and visual resources. CLUP Policy 1-3 provides: "Where there are conflicts between the policies set forth in the coastal land use plan and those set forth in any element of the County's Comprehensive Plan or existing ordinances, the policies of the coast land use plan shall take precedence."

Substantial evidence supports the finding that that Alternative 1B is consistent with the general plan's objectives and goals. (See e.g., *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 719.) There is no CEQA requirement that the project completely satisfy every policy set forth in the comprehensive general plan. (*Ibid.*; *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 817.) The FEIR states that the NPD designation and new zoning

---

[5] The NTS zone is intended to achieve a balance that provides for low density residential units, public access opportunities, preservation of the scenic and rural character of the Naples area, and conservation of open space and biological resources, compatible with the surrounding agricultural uses of the Gaviota Coast.

ordinance will "establish development standards that balance low density residential development with public access and recreational opportunities, open space, and habitat preservation while minimizing potential impacts to surrounding agricultural lands."[6]

Appellants make no showing that County's approval of the project was arbitrary or violated CEQA. "A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. . . . 'CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393.)

*Visual Resources Policy 2*

Appellants contend that the project fails to comply with Visual Resources Policy 2 which prohibits structures that intrude into the skyline as seen from a public view location.[7] The project, as approved, includes five lots that could be developed with structures protruding above the ridgeline when viewed from Highway 101. The record indicates that the skyline intrusion would be briefly visible to travelers on Highway 101. John Larson, the FEIR author, testified that the skyline intrusions "are all extraordinarily minimal, just a tiny fraction corner of a gable extending up into the skyline. But I was forbidden by staff to downplay any of those. So I will leave it to others to judge whether or not those represent violations of a policy or not."

---

[6] This is reflected in the NTS Zone Standards, section 35.26.060.D which provides: "The siting of structures shown on the Development Plan shall be based on the following factors: privacy, light and air, solar exposure, building configuration, aesthetics and preservation of public views."

[7] Visual Resources Policy 2 provides: "In areas designated as rural on the land use plan maps, the height, scale, and design of structures shall be compatible with the character of the surrounding natural environment, except where technical requirements dictate otherwise. Structures shall be subordinate in appearance to natural landforms; shall be designed to follow the natural contours of the landscape; and shall be sited so as not to intrude into the skyline as seen from public viewing places."

The FEIR analyzed the environmental concerns and trade-offs: "[B]uilding locations could be adjusted by moving the structures down slope so that their upper extent would be below the skyline (Lots 135, 193, 188, and 195). This latter solution, however, would require more grading and would place residences and development envelopes closer to stream bottoms and areas of native vegetation. The presence of other resources and the pattern of existing lots represent contraints that impede the full and strict compliance with this policy."

To address those concerns, County amended the Land Use Element to add policies and goals specific to the Naples Town Site. NPD Policy 2-26 was adopted to provide that "the visibility of new development be minimized (as opposed to outright avoidance) and that design features be employed to integrate development."[8] The overreaching purpose of the NPD zone district is to accommodate and balance competing policies. The FEIR states: "In every case, the building placement and design has been set to minimize the effect and in most cases only a very small portion of the building roofline would extend into the sky line [sic]. For these reasons, the severity of the visual change was considered low or moderate and the analyses in Section 9.9 concluded that the impacts of the Alternative 1 design from each KOP [public vantage point] were either less than significant or could be adequately mitigated."

Appellants claim that the "no skyline intrusion" policy is an inflexible standard but testimony was received that not all views are equal relative to quality of setting, duration of visibility, expectation of viewer, or degree of impact. County's

---

[8] Other mitigation measures were implemented to provide that all development within the Naples Planned Development designation remains subordinate to the rural and agrarian character of the land, that development be sighted to minimize its visibility from other public viewing areas such as trials and the ocean, and that development incorporate design flexibility in the siting of dwellings in order to minimize the disturbance of rural landscape elements, habitat areas, and overall aesthetic value of the landscape. Development north of Highway 101 must follow existing contours and cannot involve excessive grading. There are other mitigation measures including the use of detailed design review, the use of muted colors, restrictions on night lighting, landscaping to integrate development envelops with the surrounding area, and reduced building heights.

Environmental Threshold Guidelines provide that visual impact assessment " ' . . . is clearly subject to some personal and cultural interpretation. . . .' " (Italics omitted.) The scenic consistency findings require that every reasonable measure be taken to avoid or minimize the silhouetting of structures in the skyline.[9] "Such measures include, but are not necessarily limited to, lowering of structure height, reduction of grade elevations, contouring of the site, relocation of development envelopes, use of landscaping, or any combination thereof. In regard to lots 104, 105, 108, 185 and 210, every reasonable measure shall be taken to further diminish the visibility of development by application of the Design Guidelines and introduction of foreground landscaping."

The trial court found that site-specific policies to minimize visual impacts control over the more general Visual Resource Policy 2. We agree. It is well settled that specific language in a statute controls and takes priority over general language in a statute. (*San Francisco Taxpayer's Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577; see e.g., *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 515.) A local agency has unique competency to interpret the policies in its general plan and weigh competing interests in determining how to apply those policies. (*Sequoyah Hills Homeowners Assn. v. City of Oakland*, *supra,* 23 Cal.App.4th at p. 719.) "It is, emphatically, *not* the role of the courts to micromanage these development decisions." (*Ibid*.) Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.)

---

[9] Appellants' assertion that County used the Development Grid build-out scenario as an "artificial baseline" to analyze scenic impacts is nonsensical. The viewshed is the same under any project scenario. Consistent with CEQA Guidelines, the FEIR compares the project with "existing physical conditions" (i.e., the ridgeline). (Guidelines § 15125, subd. (e).)

County found that all the visual impacts, including minor roofline visibility, could be reduced to less than significant levels with mitigation.  No more is required under CEQA.  "It is nearly, if not, absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan."  (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511.)

Appellants' remaining arguments have been considered and merit no further discussion.

The judgment is affirmed.  Respondents and real parties in interest are awarded costs on appeal.

NOT TO BE PUBLISHED.


                                                            YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

Thomas P. Anderle, Judge

Superior Court County of Santa Barbara

_____


Linda Krop and Nathan Alley, for Environmental Defense Center and Surfrider Foundation, Appellants.


Marc Chytilo, Ana Citrin; Law Offices of Marc Chytilo, for Naples  Coalition, Appellant.

Dennis A. Marshall, County Counsel, County of Santa Barbara, Michael C. Ghizzoni, Chief Assistant and William M. Dillon, Senior Deputy, for County of Santa Barbara and The Board of Supervisors of the County of Santa Barbara, Respondents.


David C. Fainer, Jr., for James H. Franzen, Stephen R. Welch, and Howard M. Simon, Trustees of Rudolf Schulte Trust, Real Parties in Interest and Respondents.


Sheppard, Mullen, Richter & Hampton, Deborah M. Rosental and KDarin Dougan Vogel, for SBRHC, Inc., Real Party in Interest.