Filed 5/25/16  Certified for publication 6/15/16 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SPRING VALLEY LAKE ASSOCIATION, | D069442 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVMS1200585) |
| CITY OF VICTORVILLE, | |
| Defendant and Respondent; | |
| WAL-MART STORES, INC., | |
| Real Party in Interest and Appellant. | |

APPEALS from a judgment of the Superior Court of San Bernardino County, Donald R. Alvarez, Judge.  Affirmed in part and reversed in part.

Briggs Law Corporation, Cory J. Briggs and Anthony N. Kim for Plaintiff and Appellant.

Gresham, Savage, Nolan & Tilden, John C. Nolan and Stefanie G. Field, for Real Party in Interest and Appellant.

Graves & King, Harvey W. Wimer III and Szu-Pei Lu-Yang, for Defendant and Respondent.

INTRODUCTION

Wal-Mart Stores, Inc. (Wal-Mart) appeals from a judgment in favor of the Spring Valley Lake Association (Association) determining the City of Victorville (City) failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] and the Planning and Zoning Law (Gov. Code, § 65000 et seq.) when the City approved the Tamarisk Marketplace Project (project). Wal-Mart contends we must reverse the judgment because, contrary to the court's decision, there is substantial evidence to support the City's finding the project is consistent with the general plan and the project's environmental impact report (EIR) adequately analyzed the project's greenhouse gas emissions impacts.

The Association cross-appeals, contending we must reverse the court's judgment because the City violated CEQA by failing to recirculate the EIR after the City revised the traffic and circulation impacts analysis, air quality impacts analysis, hydrology and water quality impacts analysis, and biological resources impacts analysis. The Association also contends the City violated the Planning and Zoning Law by failing to make all of the findings required by Government Code section 66474 before approving the project's parcel map.

---

[1] Further statutory references are also to the Public Resources Code unless otherwise stated.

For the reasons stated below, we disagree with Wal-Mart's contentions and partially agree with the Association's contentions. Consequently, we affirm the judgment as to the issues raised in Wal-Mart's appeal, reverse the judgment as to certain of the issues raised in the Association's appeal, and remand the matter for further proceedings consistent with this opinion.

BACKGROUND

The project consists of 214,596 square feet of commercial retail uses on approximately 23.72 acres of land, which is currently vacant and undeveloped. Among the project's commercial retail uses is a Walmart store of approximately 184,946 square feet. The project approvals include a general plan amendment, a zone change, a site plan, a conditional use permit, and a parcel map.

After the City approved the project, the Association filed a combined petition for writ of mandate and complaint for declaratory and injunctive relief (petition) challenging the City's decision. The petition named the City as the respondent and the project applicant, Rothbart Development Corporation, as a real party in interest. Wal-Mart later intervened as a real party in interest.

The petition contained six causes of action. The first three causes of action alleged the City violated CEQA by failing to prepare an adequate EIR, failing to recirculate the EIR after adding significant new information to it, and failing to make adequate findings regarding the project's significant impacts. The fourth and fifth causes of action alleged the City violated the Subdivision Map Act (Gov. Code, § 66410 et seq.) because there was insufficient evidence to support the City's findings under Government

3

Code section 66473.5 and the City failed to make all of the findings required by Government Code section 66474.  The last cause of action alleged the City violated the Planning and Zoning Law because there was insufficient evidence to support the City's findings under Government Code section 65860.

In its opening brief below, the Association refined its position and argued the City violated CEQA by failing to recirculate the EIR after revising the EIR's analysis of the project's impacts to traffic and circulation, air quality, hydrology and water quality, and biological resources.  The Association additionally argued the City violated CEQA by failing to adequately analyze the project's impacts on greenhouse gas emissions and the project's consistency with the general plan's requirement for the project to generate electricity on-site to the maximum extent feasible.  The Association further argued the City violated the Planning and Zoning Law, including the Subdivision Map Act, because the City did not make all of the findings required by Government Code section 66474 before approving the project's parcel map, and there was insufficient evidence to support a finding the project's parcel map and zone change were consistent with the general plan's on-site electricity generation requirement.

The court granted the petition in part.  The court agreed the EIR did not adequately analyze the project's consistency with the general plan's on-site electricity generation requirement or the project's impacts on greenhouse gas emissions.  The court also agreed there was insufficient evidence to support a finding the project's parcel map and zone change were consistent with the general plan's on-site electricity generation requirement. The court denied the petition in all other respects.  The court subsequently issued a writ

4

of mandate directing the City to: (1) set aside all project approvals; and (2) take appropriate action to ensure compliance with CEQA and the Planning and Zoning Law as applicable to the feasibility of on-site electricity generation, the project's consistency with the general plan, and the EIR's analysis of greenhouse gas emissions.

DISCUSSION

I

*Wal-Mart's Appeal*

A

1

As part of the Planning and Zoning Law, "[t]he Legislature has mandated that every county and city must adopt a 'comprehensive, longterm general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning.' (Gov. Code, § 65300.) The general plan has been aptly described as the 'constitution for all future developments' within the city or county. [Citations.] '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570.)

Indeed, the Planning and Zoning Law provides: "County or city zoning ordinances shall be consistent with the general plan of the county or city . . . . A zoning ordinance shall be consistent with a city or county general plan only if both of the following conditions are met: [¶] (1) The city or county has officially adopted such a

5

plan.  [¶] (2) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in the plan."  (Gov. Code, § 65860, subd. (a).)

The Subdivision Map Act similarly provides:  "No local agency shall approve a tentative map, or a parcel map for which a tentative map was not required, unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan."  (Gov. Code, § 66473.5.) If a parcel map is not consistent with the general plan, the local agency must deny approval of it.  (Gov. Code, 66474, subds. (a) & (b).)  In addition, the CEQA Guidelines require an EIR to "discuss any inconsistencies between the proposed project and applicable general plans."  (Guidelines, § 15125, subd. (d).)[2]

2

Policy 7.1.1. of the City's general plan supports the development of solar, hybrid, wind, and other alternative energy generation.  One of the implementation measures for this policy, Implementation Measure 7.1.1.4 (IM 7.1.1.4), requires all new commercial or industrial development to generate electricity on-site to the maximum extent feasible. According to the EIR, "[t]he Project is being developed as 'solar ready.'  Specifically, the roof design of the Walmart building will accommodate the placement of photovoltaic

_____

[2]     All references to Guidelines are to the CEQA Guidelines, which are located in title 14 of the California Code of Regulations beginning at section 15000.  "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous."  (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 448, fn. 4.)

panels. Many factors go into a determination of whether development of solar panels is feasible, including whether the use of photovoltaic panels is cost effective. Should a determination be made in the future that photovoltaic panels can deliver power to Walmart at a reasonable cost over the life of the Project, Walmart and the City will negotiate adding solar energy-generated facilities to the Project."

The City elaborated on this position in responses to comments. The City stated: "Numerous factors go into a determination as to whether or not the development of solar panels is a feasible undertaking, which includes the cost effectiveness of the use of solar power. Currently, incorporation of rooftop solar for this Project is not feasible considering the uncertain timing of the Project and available tax credits and incentives that may be available at the time the Project is developed. Incorporation of rooftop photovoltaic equipment increases initial Project capital by at least $750,000. That increase in cost makes this Project economically infeasible without significant federal tax credits and certain California incentives. Unfortunately, Walmart cannot lock in incentives on new construction beyond a 12 to 18-month window. Considering the likelihood of litigation and other unknown factors, it is very possible that construction will not commence on this Project for two to three years from Project approval. Considering incentive tier levels and tax credits are constantly changing, Walmart cannot accurately estimate total costs of solar installation at the time of Project approval. Additionally, neither solar providers nor the banks financing Walmart solar projects will lock in the price long-term. With acceptable incentives, the return on investment (ROI) can be five to seven years. However, without such incentives, the ROI for installation of

7

solar facilities may exceed 15 years, which is unacceptable considering current market conditions. [¶] The bottom line is that Walmart cannot commit to the installation of solar power as part of the Project approval because the ultimate cost of such facilities is unknown."

3

Wal-Mart contends we must reverse the judgment on the points related to the project's consistency with the City's general plan because there is substantial evidence in the record to support a finding the project is consistent with the general plan overall and with IM 7.1.1.4 specifically. Whether under the Planning and Zoning Law or CEQA, " '[w]e review decisions regarding consistency with a general plan under the arbitrary and capricious standard. … [T]he inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citations.] Under this standard, we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it.' " (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 637 (*Native Plant*).)

" 'A project is consistent with the general plan " 'if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment.' " [Citation.] A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a subdivision development must be "compatible with" the objectives, policies, general land uses and programs specified in the general plan.' " (*Native Plant*, *supra*, 172 Cal.App.4th at pp. 637-638.)

In addressing a claim of inconsistency, "it is important to keep in mind the deferential nature of our review. It is not for us to substitute our judgment for that of a local agency in making a determination of consistency; rather, the agency's determination 'comes to this court with a strong presumption of regularity.' [Citation.] 'Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be "in harmony" with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions.' [Citation.] Thus, as long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance." (*Native Plant*, *supra*, 172 Cal.App.4th at p. 638.)

Here, there is no dispute the City's project approvals do not require the project to generate any electricity on-site. At most, the City's project approvals allow for the possibility the City and Walmart may mutually agree in the future to have the Walmart portion of the project generate solar electricity on-site. Thus, the City effectively found there was no extent to which it would be feasible to require the project to generate electricity on-site, whether by solar or other means.

However, there is no evidence in the record to support such a finding. The entirety of the EIR's analysis on this point is quoted above. The EIR simply states there are many factors to be considered in determining the feasibility of solar power generation. The EIR does not state what those factors might be or discuss how they fare in this circumstance, either as to the Walmart portion of the project or as to any other

9

portion of the project. The EIR also does not discuss the feasibility of other alternatives for on-site electricity generation, such as wind power.

Although the City's responses to comments editorialize one factor relevant to the feasibility of solar power generation, cost-effectiveness, the responses fall short of bridging the analytical gap between the raw evidence and the City's ultimate decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.) They do not provide facts, reasonable assumptions, or expert opinion amounting to substantial evidence to support a conclusion solar power generation or other alternatives for on-site electricity generation are completely infeasible. (Guidelines, § 15384 [substantial evidence is enough relevant information and reasonable inferences to support a conclusion and includes "facts, reasonable assumptions predicated upon facts, and expert opinion support by facts"].) Indeed, the responses show only that Wal-Mart is unwilling to commit to on-site solar power generation in advance of construction and the City did not consider the feasibility of any other potential means of on-site electricity generation. Thus, neither the EIR nor the City's responses to comments provide substantial evidence the project complies with IM 7.1.1.4.

Notwithstanding these analytical deficiencies, Wal-Mart contends the project's failure to comply with any one aspect of the general plan is not a sufficient basis for determining the project is inconsistent with the general plan as a whole. Wal-Mart presses this point further by asserting the Association has waived its general plan consistency challenge by focusing on the project's compliance with IM 7.1.1.4 rather than addressing the project's compliance with other aspects of the general plan.

10

We agree a project does not need to conform perfectly to every general plan policy to be consistent with the general plan.  (*Families Unafraid to Uphold Rural etc. v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1341 (*FUTURE*).)  Rather, in determining whether a project conflicts with a general plan, "the nature of the policy and the nature of inconsistency are critical factors to consider."  (*Ibid*.)  A project is inconsistent with a general plan "if it conflicts with a general plan policy that is fundamental, mandatory, and clear."  (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 (*Endangered Habitats*), citing *FUTURE*, *supra*, at pp. 1341-1342.)  In other words, a project's consistency with a general plan's broader policies cannot overcome a project's inconsistency with a general plan's more specific, mandatory and fundamental policies.  (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 239; *FUTURE*, at p. 1342.)

Despite Wal-Mart's contrary assertion, IM 7.1.1.4 is specific, mandatory and fundamental.  It unequivocally requires all new commercial or industrial projects to generate electricity on-site to the maximum extent feasible.  While it is conceivable there may be projects for which the maximum extent feasible equates to completely infeasible, there must still be evidence to support this determination.  Since such evidence is wholly lacking here, we cannot conclude there is substantial evidence to support the City's general plan consistency finding.

11

B

1

The EIR's air quality impacts analysis included an analysis of the project's greenhouse gas emissions impacts. Consistent with Guidelines section 15064.5, subdivision (b), the City evaluated the project's greenhouse gas emissions impacts by considering three factors: (1) the extent to which the project might increase or reduce greenhouse gas emissions compared to the existing environmental setting; (2) the extent to which the project could further or hinder the state's goals of reducing greenhouse gas emissions to 1990 levels by 2020 and to 80 percent below 1990 levels by 2050; and (3) the extent to which the project complies with regulations or requirements adopted to implement a statewide, regional, or local plan for greenhouse gas emissions reduction or mitigation.

The City concluded the project does not substantially increase greenhouse gas emissions compared to the existing environmental setting because the project's intensity is no greater than what is permissible under existing land use designations for the project site, the project's energy efficient/energy conserving design features exceed the 2008 Title 24 Building Energy Efficiency Standards for Residential and Nonresidential Buildings (Cal. Code Regs., tit. 24, pt. 6) (Title 24 standards), and the project will not generate new traffic as most of its anticipated patrons currently drive to other existing

retail/commercial establishments.[3]  The City concluded the project would support and not hinder the state's greenhouse gas emissions reduction goals for essentially the same reasons.  Finally, the City noted there were no local or regional plans for reducing or mitigating greenhouse gas emissions; however, because of the project's design features, the project would likely comply with any such plans adopted in the future.

Each of the City's conclusions is partially dependent upon and assumes the project's compliance with the general plan requirement for the project to exceed the Title 24 standards by 15 percent.  The requirement is part of general plan Policy 7.2.1, which supports energy conservation by requiring sustainable building design and development, and Implementation Measure 7.2.1.5 (IM 7.2.1.5), which requires all new construction to be 15 percent more efficient than 2008 Title 24 standards.

2

Wal-Mart contends we must reverse the judgment as to the adequacy of its greenhouse gas emissions analysis because there is substantial evidence in the record to

---

[3]     According to the EIR, the Title 24 standards are applicable to projects whose building permit applications are submitted on or after January 1, 2010.  There is a more current version of the standards for projects whose building permit applications are submitted on or after July 1, 2014.  (See http://www.energy.ca.gov/2012publications/ CEC-400-2012-004/CEC-400-2012-004-CMF-REV2.pdf.)  Although the Title 24 standards were not originally intended to reduce greenhouse gas emissions, energy-efficient buildings require less electricity, which reduces fuel consumption and, correspondingly, reduces greenhouse gas emissions.

13

support a finding the project will comply with IM 7.2.1.5 and attain the 15 percent increased energy efficiency objective.[4]  We disagree.

The EIR's discussion of the project's compliance with IM 7.2.1.5 was added after the City circulated the draft EIR.  The EIR states:  "The Project will comply with the new energy efficiency standards at the time of construction and will be constructed so as to achieve 15% more efficiency than the 2008 Title 24 standards.  The Project incorporates numerous Project Design Features (PDFs) that will reduce [greenhouse gas emissions] when compared to baseline Title 24 compliant design requirements."

While Wal-Mart contends there is substantial evidence to support a finding the project will comply with IM 7.2.1.5, the record shows to the contrary.  The EIR states in one place the project "will be designed, constructed and operated so as to achieve a minimum of fourteen (14) percent aggregate benefit in energy efficiencies beyond Title 24 Energy Efficiency Standards."  However, in other places in the EIR where this topic is discussed, including the summary of the project's energy conservation measures, the EIR states the project will only be a minimum of 10 percent more efficient in the aggregate than the Title 24 standards.  The technical reports underpinning the EIR's air quality

---

[4]     Although the Association believes the judgment correctly reflects the absence of substantial evidence on this point, the Association also believes the EIR's greenhouse gas emissions analysis is faulty because the analysis relies on an incorrect baseline.  We are not required to address whether the EIR utilized a correct baseline because the Association did not cross-appeal as to this issue and has not shown review of the issue is necessary to determine whether any error was prejudicial to Wal-Mart.  (Code Civ. Proc., § 906; *Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9.)

14

analysis also state the project will only achieve a minimum, aggregate energy efficiency improvement of 10 percent.

More telling, in a response to comment addressing the City's compliance with IM 7.2.1.5, the City acknowledged, "Currently, the Project EIR indicates that the Project will only achieve a minimum of 10% increase in the Title 24 energy efficiency standards. [¶] *While the Project's EIR and the amendment to the General Plan [adding IM 7.2.1.5] are currently not in conformity*, the Project will comply with the new energy efficiency standards at the time of construction." (Italics added.) The response to comment went on to state, "the Project EIR currently states that it will <u>at minimum</u> achieve 10% more efficiency than required by Title 24. Therefore, *several* of the Project's current energy efficient measures *likely* meet the 15% requirement." (Italics added.)

At most, the record shows the City intends for the project to exceed the Title 24 standards by 15 percent and the project may do so as currently designed. However, the record does not show the project will, in fact, exceed the Title 24 standards by 15 percent. Consequently, we cannot conclude there is substantial evidence in the record to support the City's determination the project will have no significant air quality impacts from greenhouse gas emissions.

## II

*Association's Appeal*

### A

In its cross-appeal, the Association contends we must reverse the judgment because the City did not make all of the findings enumerated in Government Code section 66474 before approving the project's parcel map. We agree.

Government Code section 66474 provides: "A legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of the following findings:

"(a) That the proposed map is not consistent with applicable general and specific plans as specified in Section 65451.

"(b) That the design or improvement of the proposed subdivision is not consistent with applicable general and specific plans.

"(c) That the site is not physically suitable for the type of development.

"(d) That the site is not physically suitable for the proposed density of development.

"(e) That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and avoidably injure fish or wildlife or their habitat.

"(f) That the design of the subdivision or type of improvements is likely to cause serious public health problems.

16

"(g) That the design of the subdivision or the type of improvements will conflict with easements, acquired by the public at large, for access through or use of, property within the proposed subdivision. In this connection, the governing body may approve a map if it finds that alternate easements, for access or for use, will be provided, and that these will be substantially equivalent to ones previously acquired by the public. This subsection shall apply only to easements of record or to easements established by judgment of a court of competent jurisdiction and no authority is hereby granted to a legislative body to determine that the public at large has acquired easements for access through or use of property within the proposed subdivision."

On its face, Government Code section 66474 requires a city to deny approval of a parcel map if it makes any one of several findings. The code section does not explicitly address what findings a city must make when, as here, it approves a parcel map.

On the other hand, Government Code section 66473.5 does explicitly address what findings a city must make before approving a parcel map. As discussed previously, Government Code section 66473.5 provides: "No local agency shall approve … a parcel map … unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan … or any specific plan . . . . [¶] A proposed subdivision shall be consistent with a general plan or a specific plan only if the local agency has officially adopted such a plan and the proposed subdivision or land use is compatible with the objectives, policies, general land uses, and programs specified in such a plan."

17

The dichotomy between the code sections lends credence to Wal-Mart's assertion Government Code section 66474 only applies when a city is disapproving a parcel map. However, when long ago asked the difference between these code sections, the Attorney General opined the provisions of Government Code section 66474 were much broader in scope and required a much wider inquiry by a local governing body than the provisions of Government Code section 66473.5.[5] (58 Ops. Cal. Atty. Gen. 21, 28 (1975).) The Attorney General further opined both code sections "require affirmative findings by the local governing body before approval is granted to a proposed subdivision map. *Should the local governing body fail to make the required affirmative finding on any matter covered by either statute or by both, it must deny approval of the map*." (*Ibid*., italics added.)

While not binding, an opinion of the Attorney General is entitled to considerable weight. (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 716, fn. 14.) Absent controlling authority, an Attorney General opinion as to the construction of a statute " ' "is persuasive because we presume that the Legislature was cognizant of the Attorney General's construction of [the statute] and would have taken corrective action if it disagreed with

---

5    The Attorney General's opinion specifically discussed former Business and Professions Code sections 11526, subdivision (c), and 11549.5. Shortly after the opinion's issuance, the Legislature repealed and replaced these code sections with Government Code sections 66473.5 and 66474, respectively. (*McMillan v. American General Finance Corp.* (1976) 60 Cal.App.3d 175, 179, fn. 1 & 180, fn. 4.) Although the Legislature has since made minor revisions to Government Code sections 66473.5 and 66474, none of the revisions affects the opinion's relevant analysis and conclusions.

that construction." ' "  (*Ibid.*; *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1013; *County of San Diego v. State of California* (1997) 15 Cal.4th 68, 103-104.)

There is some case authority supporting the Attorney General's interpretation of Government Code section 66474.  (See *Selinger v. City Council* (1989) 216 Cal.App.3d 259, 269-270 [interpreting Government Code section 66474 to require a city to deny a subdivision map application unless the city makes the findings specified by the code section].)  Some secondary sources also support the Attorney General's interpretation. (See, e.g., 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property (Tentative Maps), § 811, pp. 942-943 & (Alternative Maps), § 813, p. 946 [indicating a local agency uses all of the factors identified in Government Code section 66474 to evaluate tentative and parcel maps]; 1 Lindgren & Mattas, Cal. Land Use Practice (Cont.Ed.Bar 2015) § 9.76, p. 9-39 [referring to Government Code section 66474 and noting a local agency must deny a map application "if any one of a number findings are made" and may only approve a map application "if none of the findings can be made"].)

Conversely, none of the parties has identified nor have we located any contrary controlling authority.  In addition, the Legislature has never amended the two code sections in a manner indicating its disagreement with the Attorney General's opinion. Accordingly, consistent with the Attorney General's opinion, we conclude the City was required to affirmatively address all of the matters covered by Government Code section 66474 before approving the parcel map.

B

1

Before certifying the final EIR, the City made revisions to the traffic and circulation impacts analysis, the air quality impacts analysis, the hydrology and water quality impacts analysis, and the biological resources impacts analysis.  The City concluded the revisions did not constitute new significant information requiring recirculation of the EIR.

The revisions to the traffic and circulation analysis included an analysis of traffic impacts resulting from a delay in the City's construction of a previously anticipated road realignment.  The analysis indicated the delayed road realignment would cause four intersections to have different traffic flows.  The project would cause the level of service at one of these intersections to be reduced during evening peak hours; however, the project would not cause the level of service at any of the intersections to become deficient.

The revisions to the air quality impacts analysis included a discussion of the project's consistency with several general plan air quality policies and implementation measures, which the City had inadvertently omitted from the draft EIR.  Among the omitted information was a discussion of the project's consistency with IM 7.1.1.4 and IM 7.2.1.5.  (See part I, *ante*.)

The revisions to the hydrology and water quality impacts analysis included a complete redesign of the project's stormwater management system.  According to the EIR, the system, as redesigned, would result in a net decrease in stormwater discharges

20

and would fully retain all storm waters on-site. This precludes their potential contributions to off-site drainage concerns and promotes the replenishment of groundwater resources. Based on these features, the City concluded the project's potential hydrology and water quality impacts were less than significant.

The revisions to the biological resources analysis indicated project-related drainage improvements would increase potentially impacted streambed areas within the jurisdiction of California Department of Fish and Game from 0.33 acres to 0.79 acres. The mitigation for the impacts, consultation with the Department and compliance with any applicable streambed alteration agreement, remained unchanged. With this mitigation, the City determined the potential impacts to jurisdictional streambed areas were less than significant.

The revisions to the biological resources analysis also required spring surveys of nine special-status plants. The original analysis only required spring surveys of two special-status plants. The plants' potential to occur on-site was low and the mitigation for any sighted plants, either preservation on-site or transplant to the closest adjacent suitable preserve habitat, remained unchanged. With this mitigation, the City determined the potential impacts to special-status plants were less than significant.

2

The Association contends the revisions constituted significant new information. Consequently, the Association contends the City violated CEQA by failing to recirculate the EIR after making the revisions.

21

"Section 21092.1 provides that when a lead agency adds 'significant new information' to an EIR after completion of consultation with other agencies and the public (see §§ 21104, 21153) but before certifying the EIR, the lead agency must pursue an additional round of consultation. In [*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1129 (*Laurel Heights II*)], [the California Supreme Court] held that new information is 'significant,' within the meaning of section 21092.1, only if as a result of the additional information 'the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect.' (Accord, [Guidelines], § 15088.5, subd. (a).) Recirculation is not mandated under section 21092.1 when the new information merely clarifies or amplifies the previously circulated draft EIR, but is required when it reveals, for example, a new substantial impact or a substantially increased impact on the environment. [Citation.] [The Court] further held the lead agency's determination that a newly disclosed impact is not 'significant' so as to warrant recirculation is reviewed only for support by substantial evidence." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 447.) In applying this standard of review, we " ' "must resolve reasonable doubts in favor of the administrative finding and decision." ' " (*Laurel Heights II*, *supra*, at p. 1135.)

Here, there is substantial evidence to support the City's determination the revisions to the traffic impacts analysis did not warrant recirculation. The revisions to the traffic impacts analysis were prompted by the City's decision to delay realigning a road near the

22

project.  The potential for the delay and its impacts were addressed in the draft EIR's traffic impacts analysis and revisions to this analysis merely clarified how the delay would impact the level of service at affected intersections.  As the project would not cause the level of service at any of the affected intersections to become deficient, we cannot conclude the revisions deprived the public of a meaningful opportunity to comment on a substantial adverse environmental effect.

There is also substantial evidence to support the City's determination the revisions to the biological resources impacts analysis did not warrant recirculation.  These revisions updated the size of the streambed area potentially impacted by the project and the number and type of special-status plant species to be included in spring surveys.  As the revisions did not change the nature of the potential impacts, their likelihood to occur, or the mitigation for them, we cannot conclude the revisions deprived the public of a meaningful opportunity to comment on a substantial adverse environment effect.[6]

The revisions to the air quality analysis impacts are more problematic.  The revisions analyze the project's consistency with several general plan air quality policies and implementation measures, including IM 7.1.1.4 and IM 7.2.1.5.  As there is insufficient evidence to support the City's finding the project is consistent with these two implementation measures (see part I, *ante*), the information discloses a substantial adverse environmental effect.  Moreover, the public never had a meaningful opportunity to comment on the information because the City omitted the information from the draft

---

[6]     Given our conclusion, we need not address whether the Association failed to exhaust its administrative remedies as to the jurisdictional streambed impacts.

EIR. We, therefore, conclude the revisions to the air quality analysis constituted significant new information requiring recirculation under section 21092.1.

The revisions to the hydrology and water quality impacts analysis are likewise problematic. The revisions consist of a complete redesign of the project's stormwater management plan. Unlike with the other revisions, the City did not provide a strike-out version for these revisions showing the specific amendments to the EIR's text. Instead, the EIR states that the EIR's hydrology and water quality analysis "is globally amended to reflect current designs, information, and analysis presented in [two] June 2012 Hydrology Reports." Essentially, the City replaced 26 pages of the EIR's text with 350 pages of technical reports and bald assurance the new design is an environmentally superior alternative for addressing the project's hydrology and water quality impacts. Given their breadth, complexity, and purpose, the revisions to the hydrology and water quality analysis deprived the public of a meaningful opportunity to comment on an ostensibly feasible way to mitigate a substantial adverse environmental effect. Accordingly, we conclude the revisions to the hydrology and water analysis constituted significant new information requiring recirculation under section 21092.1

DISPOSITION

As to Wal-Mart's appeal, the judgment is affirmed.  As to the Association's cross-appeal, the judgment is reversed and the matter is remanded to the superior court for further proceedings consistent with this opinion.  The Association is awarded its costs on appeal.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

PRAGER, J.*

---

\*    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SPRING VALLEY LAKE ASSOCIATION, | D069442 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. CIVMS1200585) |
| CITY OF VICTORVILLE, | |
| Defendant and Respondent; | |
| WAL-MART STORES, INC., | |
| | ORDER CERTIFYING OPINION |
| Real Party in Interest and Appellant. | FOR PUBLICATION |

THE COURT:

The opinion in this case filed May 25, 2016, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to:  All parties