Filed 12/6/22  Friends of South Livermore v. City of Livermore CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| FRIENDS OF SOUTH LIVERMORE,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LIVERMORE,<br><br>　　　Defendant and Respondent,<br><br><br>LWCI, LLC et al.,<br><br>　　　Real Parties in Interest and Respondents. | A162471<br><br>(Alameda County Super. Ct. No. RG20054362) |

　　　Opponents of a commercial development project, having failed at the administrative level and in the trial court, appeal to this court. We conclude the opponents have demonstrated that the City of Livermore City Council's (City Council) approval of the project must be reversed because a feature of the project conflicts with a fundamental and mandatory part of the city's general plan.

1

# BACKGROUND

## I.
### *The Proposed Development and Administrative Process*

Friends of South Livermore (Friends) describes itself as "an unincorporated association of citizens, property owners, taxpayers, and electors residing in the City of Livermore . . . advocating for just, equitable and responsible land use planning and policy, as well as diligent enforcement of planning and environmental laws in and around Livermore, and particularly in the South Livermore Valley."

The South Livermore Valley is about six miles in length and comprises almost 1900 acres and was once exclusively agricultural and devoted to vineyards. The City of Livermore (City) adopted the South Livermore Valley Specific Plan (SLVSP) in 1997 and amended it in 2004 to govern residential and commercial growth in the valley while retaining its reputation as "a premium wine-producing region." Another aim was to foster tourism with "tourist-related projects" and "tourist serving retail uses." "[S]uch uses could include a wine museum, a culinary institute, conference center, or a resort hotel. These destination-type uses would be complimented by tourist-serving retail uses, such as restaurants, bicycle rentals, art galleries, or other small-scale uses that would contribute to the creation of an attractive, full-service destination for visitors to the wine country."

As will be shown, one of the commercial uses anticipated by the SLVSP was a "Wine Country Inn," which was described as follows: "Hotel facility with no more than 30 guest rooms. May have a large restaurant associated with it. Maximum site size is 3 acres. Maximum FAR [floor area ratio] is 0.25." The proposal to build this project is at the center of this dispute.

Friends opposed the proposal of LWCI, LLC and Michelle Boss (real parties in interest) to construct a 29,345-square foot, two-story building for a

30-room "Wine Country Inn" that would have a 77-seat restaurant, a lobby with a wine bar and reception area, a lounge area with outdoor seating, a manager's office, a conference room, kitchen, parking lot for 61 vehicles, and a caretaker's unit, all on a 3.2-acre parcel.

In November 2019, the Livermore Planning Commission approved the site plan design review and conditional use permit application and issued a mitigated negative declaration (MND) under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq. (CEQA)). The Commission made various findings, including that the project "conforms to all setback standards." Friends appealed the decision to the City Council, which affirmed the Planning Commission's decisions and adopted its findings as the Council's own.

## II.
### *The Lawsuit*

After its administrative opposition failed and the City approved the project, Friends moved to the courts, alleging that the approval contravened: (1) the City's General Plan; (2) its SLVSP (which is a "special" plan and a component of the General Plan); (3) its Planned Unit Development Amendment (PUDA); and (4) its Municipal Code. Specifically, Friends alleged that "The Project's inconsistencies and incompatibilities with these planning documents include, but are not necessarily limited to, violations of the roadway setback requirements contained in the SLVSP; violations of the commercial design standards and guidelines contained in the SLVSP; violations of the land use restrictions contained in the SLVSLP and PUDA 01-001; and violation of the parking requirements of the Livermore Municipal Code." According to Friends, the City "abused its discretion by approving the Project notwithstanding these inconsistencies and incompatibilities and by

adopting findings of consistency that are clearly erroneous and not supported by substantial evidence."

Friends further alleged that the City violated CEQA by adopting a mitigated negative declaration (MND) for the project. According to Friends, CEQA allows an MND "only if an initial study shows there is no substantial evidence in light of the whole record before the agency that the project may have a significant effect on the environment." "Here, there is substantial evidence in light of the whole record before the City that the Project not only may but will have significant direct, indirect, and cumulative effects on the environment, in areas including but not limited to traffic and circulation, public safety, noise, aesthetics and visual resources, and biological resources. The City therefore had a mandatory duty under CEQA to prepare and circulate a full EIR [Environmental Impact Report] for the Project before taking any action to approve it."

## III.
### *The Trial Court Decision*

The trial court ruled against Friends. The relevant portions of the court's Order Re: Petition for Writ of Mandate—omitting an issue not raised in this appeal and including minor non-substantive editorial modifications— read as follows:

"<u>Standard of Review</u>

"The applicable standard of review is whether the City abused its discretion when it approved the Project. (Code Civ. Proc., § 1094.5, subd. (b).) The City's determination that the Project is consistent with the SLVSP 'is entitled to deference as an extension of [its] "unique competence to interpret [its] policies when applying them in its adjudicatory capacity." ' (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 155 [*Orange Citizens*], citing *San Franciscans Upholding the Downtown Plan v.*

4

*City & County of San Francisco* (2002) 102 Cal.App.4th 656, 678 ('*San Franciscans*').) A court should look to a city's determination 'with a strong presumption of regularity.' (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717 ('*Sequoyah Hills*').) Friends has the burden of proof and 'the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination.' (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497-1498 ('*County of Napa*'), citing *San Franciscans, supra*, 102 Cal.App.4th at [p.] 674.) It is impermissible for a court to substitute its view 'for that of the city council, nor reweigh conflicting evidence presented to that body.' (*Sequoyah Hills, supra*, 23 Cal.App.4th at p. 717.) [¶] It is the petitioner's burden to prove that a project directly conflicts with 'very specific and mandatory policies' such that 'no reasonable person' could conclude they were consistent. (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 518 ('*San Francisco Tomorrow*').) The law does not require an exact match between a proposed development project and the applicable land use plan. (*Id.* at [p.] 514 quoting *Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 817.) Rather, to be ' "consistent, a [project] must be *compatible with* the objectives, policies, general land uses, and programs" ' in the applicable plan. (*County of Napa, supra*, 121 Cal.App.4th at [p.] 1509, italics added, quoting *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 ('*FUTURE*').)

<u>"Setbacks in the SLVSP</u>

"As approved, the Project has a 50' setback from Hansen Road and within that area is both landscaping and parking spaces. Friends argues that this setback is in direct conflict with the SLVSP, which requires a 100'

setback from 'all' public roadways, and that those setbacks must be planted with vineyards and orchards. Friends asserts that, among other things, the use of the word 'shall' makes this language mandatory and fundamental to the SLVSP. It its opening brief, Friends also contends:

"Maintaining broad, planted, agricultural setbacks of at least 100 feet from all roadways is a primary means—if not *the* primary means—of ensuring the 'gradual and graceful transition from urban to rural,' while providing the 'softer edge' separating agricultural from commercial uses. Policy 4-7 is therefore 'fundamental' to the SLVSP's overarching policy vision and goals.

"Friends concludes that the City's failure to require the 100' setback along Hansen Road, when it approved the Project, constitutes an abuse of discretion.

"The Court rejects Friends' argument for two reasons.

"First, the section of Hansen Road that is at issue in this case did not exist when the SLVSP was adopted. While the SLVSP noted the potential for a road to continue as an extension of Hansen Road to the west of Arroyo Road, the public roadway was not there. Friends has not provided any information from the record that clearly demonstrates how, if at all, the City contemplated it would address the width and landscaping of setbacks for future roads that were not in existence at the time of the approval of the SLVSP. Instead, the clearest indication of how the City viewed the appropriate interpretation of the setback language in the SLVSP is how it in fact . . . interpreted that language when it approved the Public Unit Development Permit four years later (in 2001), which was at or about the time Hansen Road was constructed to the west of Arroyo Road. . . . [T]he

6

Planned Unit Development Permit states that for 5D2 [the site designation for the project]:

"Setbacks:

"a. Building setbacks for all commercial uses shall be 100 feet from road frontages (setback shall be measured from the closest commercial building to the nearest right-of-way frontage). Setback areas shall be planted with orchard or vineyards.

"b. Setbacks from Hansen Way: 50 feet.

"c. Side and rear yard: none, provided consistent with Chapter 12 of the Specific Plan.

"Thus, the first time the City evaluated how to address a setback from the newly constructed Hansen Road, it concluded, now twenty years ago, that the appropriate setback from Hansen Road was 50', with no specific landscaping requirements. This Court views the City's determination regarding the setback from Hansen Road 'with a strong presumption of regularity' and finds that a reasonable person could conclude that the SLVSP and the PUD Permit are consistent in this regard. As a result, the Court finds that the City did not abuse its discretion when it approved the Project with the 50' setback from Hansen Road.

"Second, even if the SLVSP and the PUD Permit are inconsistent with regard to the setback from Hansen Road, the Court should only set aside a project approval if there is a conflict with a '[1] fundamental, [2] mandatory and [3] specific land use policy.' (*FUTURE, supra*, 62 Cal.App.4th at [p.] 1341.) Friends has failed to meet its burden of proof that a 100' landscaped setback from Hansen Road was fundamental, mandatory and specific to achieving the goals of the plan. It is clear that the SLVSP contemplated the development of a wine country inn, which was in turn

7

further supported in the PUD Permit.  The City has now approved a wine country inn in the area that was specifically anticipated in both documents. While setbacks and landscaping play a role in the aesthetics of a development project, the City concluded that approving the Project with a wine country inn with a setback of 50' (instead of 100') along one side of the property, and planting trees (instead of vines) in that setback, met the applicable policies and development standards as set forth in the SLVSP and the PUD Permit. This Court does not find that no reasonable person could have come to the same conclusion as the City.  Therefore, on this related point, the Court finds the City did not abuse its discretion when it approved the Project with the 50ʹ setback from Hansen Road.

"<u>Floor Area Ratio</u>

"Next, Friends alleges that the Project's Floor Area Ratio unlawfully exceeds the SLVSP's mandatory limit of 25.  Specifically, Friends contends that the City improperly omitted the square footage of the inn's enclosed balconies and decks, and the caretaker's residence.  The City addressed this issue in both its Opposition brief and during oral argument and stated that because the Project has many spaces that are partially enclosed (e.g., covered decks and walkways), it conducted a detailed analysis to assess the square footage and concluded the Project as approved comports with the FAR requirements of the SLVSP.  The Court finds that Friends failed to meet its burden to show that the City's determination that the Project complies with all applicable development regulations, including FAR limitations, was unreasonable or unsupported by substantial evidence.  The Court denies Friends' request for writ of mandate as to this issue.

* * * *

8

<u>"The City's Determination that the Project Would have no Significant Impacts</u>

"Friends' final argument is cumulative. Friends contends that for the reasons set forth in its previous arguments, the City's Initial Study prepared pursuant to CEQA, wrongfully determined the Project would have no significant impacts on land use and planning. Because the Court has rejected Friends' previous arguments as addressed above, the Court denies Friends' request for writ of mandate as to this final issue."

Friends purported to file a notice of appeal from the Order Re: Petition for Writ of Mandate, but that was a non-appealable interlocutory order, as shown by the fact that an actual judgment was subsequently entered. However, pursuant to the policy of liberally construing a notice of appeal in favor of its sufficiency (Cal. Rules of Court, rule 8.100(a)(2)), Friends' notice will be treated as sufficient to commence a valid, if premature, appeal from the subsequent judgment (*id*., rule 8.104(d)(2)).

## DISCUSSION
### I.
### *Opening Comments and Legal Standards*

Although Friends has on occasion characterized this as "a CEQA case," that characterization is somewhat misleading. In its 47-page opening brief, there is argument on a single CEQA issue, which is made last and occupies barely more than a page. The CEQA issue framed by Friends is predicated on the claims addressed by 46 of the 47 pages that the City's approval of the project violated local law, specifically, two of the policies in the City's own SLVSP. Thus, the CEQA claim is merely an extension of the local law claims.

9

Accordingly, the primary issues in this appeal concern whether approval of the project was in conformity with municipal law, specifically the SLVSP. But the SLVSP is not a run of the mill local ordinance.

"The Legislature has mandated that every county and city must adopt a 'comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning.' (Gov. Code, § 65300.)[1] The general plan has been aptly described as the 'constitution for all future developments' within the city or county. [Citations.] '[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.' [Citation.] To be sure, the general plan is not immutable, far from it. But it may not be trifled with lightly . . . ." (*Citizens of Goleta Valley v. Bd. of Supervisors* (1990) 52 Cal.3d 553, 570-571; accord, *Orange Citizens, supra,* 2 Cal.5th at pp. 152-153.)

" ' "The consistency doctrine has been described as 'the linchpin of California's land use and development laws; it is the principle which infuse[s] the concept of planned growth with the force of law'. . . ." [Citation.]' " (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 949-950.) A general plan can only be amended by the local legislative body (§§ 65356, 65358)[2] and only in a specified manner. (§ 65356; see generally *Orange Citizens,* at pp. 152-154 [describing required opportunities for involvement of public input from specified public entities, public hearings,

---

[1] Statutory references are to the Government Code unless otherwise indicated.

[2] The initiative and referendum power may also be exercised to amend or prevent the amendment of the general plan. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 777.)

10

and production of internally consistent and compatible statement of policies].) It must include at least " 'seven elements—land use, circulation, conservation, housing, noise, safety and open space—and address [them] in whatever level of detail local conditions require.' " (*Foothill Communities Coalition v. County of Orange* (2014) 222 Cal.App.4th 1302, 1310 (*Foothill Communities*).) " 'General plans are also required to be "comprehensive [and] long[]term" [citation] as well as "internally consistent." [Citation.] The planning law thus compels cities and counties to undergo the discipline of drafting a master plan to guide future local land use decisions.' " (*Ibid.*)

A specific plan generally is on the rung very slightly below the general plan (7 Miller & Starr, Cal. Real Estate (4th ed. 2022) Land Use, Planning and Zoning Laws, § 21:7) and is used to implement the general plan in all or part of the geographical area covered by the general plan. (§ 65450.) A specific plan must be consistent with the local government's general plan (§ 65454), must address certain subjects (§ 65451) and may include other subjects deemed necessary to implement the general plan (§ 65452).

A zoning ordinance is the third rung on the ladder and must be consistent with the general and any specific plan. (§§ 65454-65455; 7 Miller & Starr, Cal. Real Estate, *supra*, § 21:8.)

Subordinate decisions and approvals, such as subdivision maps, development agreements, conditional use permits and building permits must be consistent with the general plan and any existing specific plan. (§ 65867.5; see *Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal.App.3d 1176, 1184-1185; *Friends of "B" Street v. City of Hayward* (1980) 106 Cal.App.3d 988, 998-999; *Foothill Communities*, *supra*, 222 Cal.App.4th at pp. 1310-1311.)

11

The SLVSP was adopted by the City Council in 1997 as "an extension of [the City's] General Plan,"[3] which directs that it be "used as both a policy and a regulatory document to guide the quantity, location and character of development in the South Livermore area." In adopting the SLVSP, the City Council provided that, "[f]or projects within the South Livermore Valley Specific Plan Area, polices and standards in the Specific Plan will take precedence over more general policies and standards applied throughout the rest of the City." In essence, the City Council placed the SLVSP as high as or higher on the regulatory ladder than the general plan itself with respect to land use in the area covered by the SLVSP. Not surprisingly, the parties analyze the issue of consistency with the SLVSP as if it were the general plan, and we will do the same.

In general, the judicial attitude on review of local government decisions about conformity with a general plan is deferential. "A project need not conform perfectly to every general plan policy to be consistent with the general plan. [Citation.] The rule of general plan consistency is that the project 'must be "compatible with the objectives, policies, general land uses, and programs specified in" ' the general plan. [Citation.] '[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the

_____

[3] The SLVSP covers an unincorporated area along the City of Livermore's southern boundary. The County of Alameda and the Cities of Livermore and Pleasanton worked together with other stakeholders to develop the plan, which the City of Livermore then adopted.

12

plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 501.)

This court has said: "It is, emphatically, *not* the role of the courts to micro-manage these development decisions. Our function is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Sequoyah Hills, supra,* 23 Cal.App.4th at pp. 719-720.)

We also held that the city officials' decision comes with "a strong presumption of regularity," and "[w]e may neither substitute our view for that of the city council, nor reweigh conflicting evidence presented to that body." (*Sequoyah Hills, supra*, 23 Cal.App.4th at p. 717.) Hence, " '[t]he party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable.' " (*Stop Syar Expansion v. County of Napa* (2021) 63 Cal.App.5th 444, 461; *Clews Land & Livestock, LLC v. City of San Diego* (2017) 19 Cal.App.5th 161, 201.)

"If the agency's decision is not arbitrary, capricious, unsupported, or procedurally unfair, it is upheld." (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1192.) According to our Supreme Court: "Reviewing courts must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Orange Citizens, supra,* 2 Cal.5th at p. 155.) The same deferential standard of review pertains to appellate and trial court decisions. " 'We review the agency's decision regarding consistency with its general plan "directly, and are not bound

13

by the trial court's conclusions." ' " (*Joshua Tree Downtown Business Alliance v. County of San Bernadino* (2016) 1 Cal.App.5th 677, 696 (*Joshua Tree*).)

Even this high degree of deference, however, does not mean that local authorities have carte blanche to disregard their general plan. When we apply the abuse of discretion standard of review "in determining whether a project conflicts with a general plan, 'the nature of the policy and the nature of the inconsistency are critical factors to consider.' [Citation.] A project is inconsistent with a general plan 'if it conflicts with a general plan policy that is fundamental, mandatory, and clear.' [Citations.] In other words, a project's consistency with a general plan's broader policies cannot overcome a project's inconsistency with a general plan's more specific, mandatory and fundamental policies." (*Spring Valley Lake Assn. v. City of Victorville* (2016) 248 Cal.App.4th 91, 100-101 (*Spring Valley Lake*).) "A 'clear' inconsistency with even a single 'fundamental, mandatory and specific land use policy' may be 'enough to scuttle a project.' [Citation.] By contrast, a local agency has ' "some discretion" ' when it comes to a relatively 'amorphous' policy (such as a policy of ' "encourage[ing]" development "sensitive to natural land forms, and the natural and build environment." ' " (*Joshua Tree, supra,* 1 Cal.App.5th at p. 697.)

Our role requires us only to determine "whether the City abused its discretion in finding the Project consistent with the . . . General Plan." (*Orange Citizens, supra,* 2 Cal.5th at p. 154.) We "must defer to a procedurally proper consistency finding unless no reasonable person could have reached the same conclusion." (*Id.* at p. 155.)

14

## II.
### *Friends' SLVSP Claims*

Friends advances a pair of contentions that are founded on the City's asserted non-compliance with its own SLVSP. We will address each claim separately.

### A.    Setback Requirements

The parties agree that the SLVSP is a part of the City's general plan and treat it as such for purposes of addressing the consistency requirement. The stated "Goal" of the SLVSP for commercial uses is "To provide for limited small-scale commercial development that supports and enhances the South Livermore Valley's image as a premium wine-producing region."

It is explained that "Commercial development in the planning area is intended as an amenity that will enhance the experience of visitors to the South Livermore Valley wine country. Only those commercial uses that support wine-related tourism will be permitted. Commercial uses that primarily serve local residents are more appropriate for neighborhood or downtown commercial areas, and are therefore prohibited within the Specific Plan area." The plan identifies 15 sites as the ones that may be used for "possible commercial" uses and "is very specific about what types of commercial uses will be permitted on each site." The permitted uses include "boutique," "small," and "medium" wineries; a small olive mill; large and small restaurants; "Bed-and-Breakfast" and "Wine Country Inn[s]"; and a Wine Country Center providing wine-country related uses such as bicycle rentals, art galleries, delis and restaurants. The plan states which uses will be permitted on each of the subareas containing the identified sites and limits the size of the nonagricultural developments by specifying a maximum floor area ratio (ratio between floor space and lot size) or a total number of square feet. These limitations are stated in the descriptions of the permitted

15

uses and also as general policies governing the commercial developments. The FAR policy requires that commercial uses "maintain a small, pedestrian scale." Additional policies require that commercial uses provide 100-foot building setbacks and that their facilities have designs "consistent with the rural, wine country character of the area." "Wine Country Inn"—the type of development contemplated here—is described as follows: "Hotel facility with no more than 30 guest rooms. May have a large restaurant associated with it. Maximum site size is 3 acres. Maximum FAR is 0.25."

The building setback policy, on which Friends relies, is "Policy 4-7." It reads: "Building setbacks for commercial uses shall be 100 feet from road frontages, except for commercial site #3A, which shall be 25 feet. All setback areas shall be planted with vineyards or orchards." (Italics omitted.)

The policies are implemented by various "Commercial Design Standards & Guidelines." Under the section on "Site Layout," is the following: "A 100 foot planted building setback is required from all public roadways for every commercial site except site 3A2 (small restaurant or tasting room at the proposed Concannon-Wente intersection)." (Italics omitted.)

In its opening brief, Friends notes other facts it deems pertinent: "Notably the SLVSP itself specifies in a Table that the location of agricultural buffers,[4] their minimum depths, and the requirement that they be planted and cultivated with an agricultural crop are '**fixed**' plan elements, not '**flexible**' provisions that would be open to subjective interpretation.[5] . . . [¶]

---

[4] The SLVSP refers to a setback as an "agricultural buffer."

[5] The "[p]recise dimensions of [the] buffer," presumably meaning other than the "minimum depth," is in the "flexible" category, as is the "type of planting," which we presume means which kinds of agricultural crops, for example, olive trees or grape vines.

16

The SLVSP includes a diagram for a commercial development scenario, a 'wine country inn and restaurant' on Site 5D2.[6] The diagram includes a notation stating: 'Required setback (agricultural buffer) 100 feet from Arroyo Road.' "

Friends' position, developed at length in its opening brief, reiterates its stance in the trial court. Friends submits that when Policy 4-7 of the SLVSP says that setbacks "shall" be 100 feet, which means it is a mandatory, "fixed" and inflexible policy determination that the City is not competent to waive, ignore, or compromise. This is a direct challenge to the trial court's conclusion that "a 100' landscaped setback *from Hansen Road*" did not qualify as a "fundamental, mandatory and specific" land use policy of the general plan. (Italics added.)

After considerable examination of the matter, we believe the trial court posed the wrong question. The issue is not whether a single setback on Hansen Road is "fundamental, mandatory and specific." Nor is it, as the City and real parties frame it, whether, in the abstract, "[t]he City's determination that the Project is consistent with the SLVSP is reasonable and is supported by substantial evidence." The latter question is the ultimate one, but our

---

[6] To be strictly accurate, there are two diagrams in the SLVSP. Friends quotes from the language next to the first diagram of the "Wine Country Inn and Restaurant," which identifies it as comprising "Sites 4C, 5D1, and 5D2," all of which are to the west of Arroyo Road. The second diagram has Site 4C located east of Arroyo. Friends has included the first diagram in its brief, which we take to mean that Friends is representing that the design depicted in this diagram is the one approved by the City Council. While there are specific comments regarding each of the three sites, under the heading "Analysis—All Sites," the diagram states, "Required setback (agricultural buffer): 100 feet from Arroyo Road."

answer to it must rest on a determination of what the scope of the 100-foot setback policy in the SLVSP is and whether that *policy* is fundamental, specific and mandatory. (See *FUTURE*, *supra*, 62 Cal.App.4th at p. 1341 [framing questions as whether "the land use policy at issue here is fundamental," whether "the policy is also mandatory" and whether the policy was specific ("anything but amorphous")].)

Here, it appears beyond serious dispute that Policy 4-7, by using the word "shall," which is ordinarily accepted as a word of positive command (e.g., *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1143; *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443), and the implementing design guidelines, which specify that a 100-foot setback is "required," make clear that setbacks from public roads are not optional. In short, they are mandatory.

And the language of Policy 4-7, that "[b]uilding setbacks *for commercial uses* shall be 100 feet *from road frontages*" and that "[a]ll setback areas shall be planted with vineyards and orchards," as well as the language of the implementing guideline, that "[a] 100 foot planted building setback is required from *all public roadways for every commercial site*" demonstrate that the setback policy with its 100-foot and planting requirements was intended to be universal. (Original italics omitted and italics added.) That is, the requirements apply to all commercial developments fronting on public roads throughout the area governed by the SLVSP. Further indicative of their general applicability is the fact that the policy contains a single exception, for "commercial site #3A."[7]

---

[7] The SLVSP requires that site to have a setback of 25 feet but does not exempt it from the planting requirement. While the plan does not spell out precisely why the smaller setback is required for parcel 3-A, it indicates that "[s]ubarea #3, unlike most of the other subareas, adjoins existing

18

In short, the setback policy, including the number of feet required and the further requirement that setbacks be planted with vines or other specified vegetation, is mandatory and generally applicable throughout the area covered by the SLVSP.

We also conclude that the setback provisions are "fundamental," a determination that requires consideration of the nature of the policy and its centrality to the goals and objectives of the General and Specific Plans.

The SLVSP is not a hastily conceived or adopted measure. It was adopted in 1997 and amended in 2004. It is a substantial enactment numbering more than 400 pages, was the product of many years of effort and was "developed with a thorough analysis of environmental conditions and extensive input from City decision-makers, landowners, neighbors, and the community-at-large." It was intended not only to "provide[] a comprehensive land use program," but also the "goals, policies, and development standards to guide future public and private actions" as well as "a strategy for insuring the Plan's implementation." Thus, it aimed to "be used as both a policy and regulatory document."

The plan also stated what it was meant to be in practice: "When private development proposals for the planning area are brought before the City, the planning staff will use the Specific Plan as a guide for project

---

suburban uses" and that "[g]iven the adjacent residential subdivision and community park, new development in Subarea#3 is likely to be perceived as a logical extension of existing development patterns. The development concept thus concentrates less on establishing a new 'rural' development patterns [*sic*], and more on establishing a transition from the existing suburban development to a permanent rural edge." The plan goes on to discuss pushing the development in this area as far to the north and west as possible, near to existing subdivision development, and providing substantial agricultural buffers on the south and east sides and a berm on the south side to accommodate the planting and harvesting of vineyards.

19

review. Projects will be evaluated for consistency with the intent of plan policies and for conformance with development standards and design guidelines. For projects within the South Livermore Valley Specific Plan area, policies and standards in the Specific Plan will take precedence over more general policies and standards applied throughout the rest of the city."

Finally, the SLVSP's approach to setbacks makes it a subject where the legislative purpose and intent are clear. A major thrust of the plan is to preserve the character of the South Livermore Valley as a prime "grape-growing and wine-producing area." The plan was designed to preserve and expand "viticultural acreage south of the city," "enhance the recognition and image of the area as an important premium wine-producing region," and "preserve the area's unique rural, scenic and historic qualities." Avoiding new development that was "just an extension of existing suburban development patterns," the plan was designed to create "a new and permanent 'edge' to the urban area" with "development patterns that provide a more gradual and graceful transition from urban to rural." "By carefully integrating the new development with the agricultural setting, the plan attempts to reduce the visual impact on the rural character of the Valley, and increase the open space amenity value for the new development."

The policies the plan sets forth for commercial development, including the setbacks policy, are the means by which the plan furthers its overarching goals of preserving and enhancing the rural, wine-country character and image of the area.

Moreover, the standard for the depth of the setbacks and the requirement that they be planted with vineyards or orchards are clear and specific, not amorphous, imprecise or otherwise open to subjective interpretation. Plainly, the City envisioned the 100-foot depth and the

20

agricultural planting would be the norm. Indeed, it is difficult to imagine how the drafters of the SLVSP could have been more explicit.

Accordingly, unlike the trial court, we conclude the SLVSP's setback policy is a mandatory, fundamental and specific land use policy that does not permit discretionary enforcement.

Nor can we agree with the trial court's alternative ground for denying Friends relief, namely, that "the section of Hansen Road that is at issue in this case did not exist when the SLVSP was adopted." Even if true,[8] this is not legally relevant because there is nothing in the SLVSP indicating that its provisions and policies applied only to existing roads. Again, the framers of the SLVSP knew how to craft exemptions, and they did not do so for future

---

[8] Both of the diagrams (dis. opn., *post,* page 3) clearly show Hansen Road, thus indicating that it was in existence when the SLVSP was adopted in 1997 or when it was amended in 2004. In fact, the trial court's statement of decision designates 2001 as the time when "Hansen Road was constructed to the west of Arroyo Road." However, the diagrams indicate that in 1997, Hansen Road ended at Arroyo Road and did not proceed across Arroyo or intersect site 5D. A potential "[f]uture entry road" was depicted on the diagrams directly across from where Hansen ended at Arroyo and the SVLSP provided that access to the development would be from this road.

By the time the City approved the project, Hansen Road had been extended across the site and beyond. As the Planning Commission Resolution states, "The project is bound by Hansen Road to the north and Arroyo Road to the east. . . . [¶] . . . [¶] The site will be accessed from Hansen Road, which provides adequate emergency vehicle access to the site. . . . [¶] The local streets, including Arroyo Road and Hansen Road, have been designed to handle the vehicle trips generated by the full build-out of the Specific Plan, including development of a 30-room inn and restaurant with up to 100 seats on the project site. Arroyo Road and Hansen Road are classified as collector streets. According to the Circulation Element of the General Plan, collector streets are medium capacity streets with volumes ranging from 5,000 to 20,000 vehicles per day, which is sufficient to carry the anticipated cumulative traffic volume for the project and existing and planned developments in the vicinity . . . ."

21

roadways. Such an intent would be completely at odds with the SLVSP's aesthetic goals and its stated intent to "provide[] a *comprehensive* land use program . . . to guide *future* public and private actions." (Italics added).

Contrary to the trial court's reasoning and the argument of the City and real parties, the SLVSP could not be revised, altered, or relaxed by reference to the Public Unit Development Permit, as the trial court appears to have concluded. As already shown, the SLVSP, as part of the city's general plan, could only be amended in certain specified ways. Approving a permit is not one of those ways. (See §§ 65350, 65353-65356; *City of Sausalito, supra*, 12 Cal.App.3d at p. 564 [amendment must be made in same mode as original enhancement].)

Notwithstanding the policy of substantial judicial deference to municipal decisions of this sort, the approval of this project falls outside the ambit of that deference because there was no need to " 'weigh and balance the . . . policies when applying them' " (*Golden Door Properties, LLC v. County of San Diego, supra*, 50 Cal.App.5th at p. 501) in the sense that there was nothing to balance; all the City had to do was to apply its fixed policy of requiring 100-foot setbacks. Accordingly, "no reasonable person could have reached the same conclusion" as the City Council did here (*Orange Citizens, supra*, 2 Cal.5th at p. 155), that is, that in reducing the 100-foot setback to a 50-foot setback on Hansen Road, it was acting in conformity with the SLVSP. Put another way, the finding of the Planning Commission—which the City Council adopted—that "[t]he site plan shows that the building meets all setback standards" is not only legally erroneous, but also an abuse of the City Council's discretion (*FUTURE, supra*, 62 Cal.App.4th at p. 1342) and is not supported by substantial evidence. (See *Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.)

The City and real parties tell us that it is the City, not Friends "or the courts, [which] is in the best position to interpret the appropriate application of its own Specific Plan." In general this is a sound principle, one that courts ordinarily respect. But the City will not be suffered to declare fundamental policy and then fail to apply it. This is not an example of judicial micromanaging. It is simply accepting the City's own SLVSP at face value and requiring that current City officials follow through in conformity with its own fundamental and mandatory policy. (See *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 789 ["a county cannot articulate a policy in its general plan and then approve a conflicting project"].)

## B. Floor Area Ratio Calculations

The second SLVSP-related contention pressed by Friends is stated in the caption of its brief as follows: "The City unlawfully omitted the attached caretaker's residence and hotel patios from the Project's floor area ratio calculations in violation of the SLVSP and Livermore Development Code."

Friends reasons that SLVSP Policy 4-6 states that "Commercial uses . . . will not exceed an FAR of 0.25." Another provision in the "Land Use Plans/Conceptual Site Plans" of the SLVSP, directed to "Wine Country commercial," states that "Floor Area Ratios (FAR's) in this designation shall not exceed 0.25." There is nothing in the SLVSP that defines "floor area ratio." The parties tacitly accept that the term is as defined in the Livermore Development Code (code): "**Floor Area**. The sum of the gross area of all stories of a building, measured from the exterior faces of the exterior walls. The floor area shall include any building that has a roof and is enclosed so as to provide shelter from the elements on three or more sides." The parties apparently also agree that, applying that ratio to the 3.2-acre site on which

23

the development is to be built results in a maximum floor area of 32,500 square feet.

According to Friends: "The FAR calculations appear as annotations to the Project's site plan. They show the City and [real parties] calculated the total gross square footage on both floors of the hotel to be 29,345 sq. ft., below the 32,500 sq. ft. limit. However, the record discloses that the **City entirely omitted the 2,200 sq. ft. caretaker's residence** from the FAR calculation. This omission was unlawful and material given that the [code] expressly requires a FAR calculation to include '**any** building that has a roof and is enclosed so as to provide shelter from the elements on three or more sides.' Had the caretaker's residence square footage been included in the calculation as the [code] required, the total floor area is actually 38,367 sq. ft.—far exceeding the 32,500 sq. ft. maximum."

The numbers in the foregoing paragraph do not add up. If the square footage of the hotel and restaurant building is 29,345, as Friends states, and the caretaker's residence has 2,200 square feet, the total would be 31,545—a figure slightly below the maximum 32,500 square foot figure. However, Friends asserts there was a second omission that, if included, would bring the total square footage above the maximum. Specifically, Friends contends that "the City also improperly excluded the square footage of the Project's enclosed balconies from the FAR calculations. These balconies, which attach to rooms on both the first and second floor, contain square footage totaling 6,722 sq. ft." There is no error in Friends' math regarding the balconies, but its argument about the balconies is predicated on two further assertions— that the balconies are all enclosed on three sides and that the code required them to be included in the FAR calculation.

24

Contrary to Friends' argument, whether the code requires inclusion of balconies is not entirely clear. The code defines "Floor area" as "The sum of the gross areas of all stories of a building, measured from the exterior faces of the exterior walls. The floor area shall include any building that has a roof and is enclosed so as to provide shelter from the elements on three or more sides." Even assuming this definition includes any part of a building that meets these criteria, Friends cites no evidence that the balconies were to be covered by the roof of the building or that all of them are enclosed on three sides.

The City and real parties argue that Friends failed to exhaust administrative remedies on this issue and that in any event Friends failed to meet its burden to show the City's conclusions regarding the FAR are not supported by substantial evidence.

We are not persuaded that Friends failed to exhaust administrative remedies. As it points out, the issue was raised during the administrative proceedings, albeit by another participant. In such circumstances, vicarious exhaustion is permitted. (Cf. Pub. Resources Code, § 21177, subd. (a) [a CEQA "action or proceeding shall not be brought . . . unless the alleged grounds for noncompliance . . . were presented to the public agency orally or in writing *by any person*," italics added]; *Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1228, fn. 9.)

Turning to the merits, however, we are persuaded by the City's and real parties' argument. They contend that the site plan on which Friends relies for its assertion that the FAR requirement was not met does not specify what is included in and excluded from the 29,345 square foot calculation, and that the city manager testified at the administrative hearing that city staff had included the enclosed balconies in its FAR calculation. They further

25

assert that the FAR limitations in the SLVSP apply only to the commercial uses and do not apply to the caretaker residence, which is "a separate, ancillary use."

We agree that the evidence on which Friends relies fails to show the City excluded required floor area from its FAR calculation. The evidence cited by the parties is less than clear on the point, but as Friends concedes in its reply brief, "it bears the burden of showing that the City's determination that the Project complies with the SLVSP's FAR limitation is not supported by substantial evidence." (See *San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 674 [parties seeking mandamus bear burden of proving error].)

Here, the record shows that the City considered the issue and concluded the FAR standard was met, and the evidence Friends cites does not show the calculations of the project's FAR exceeded the 0.25 ratio of floor area to building site square footage set forth in the SVLSP.

Because Friends has failed to demonstrate any inconsistency, its argument fails even assuming the FAR policy is fundamental to the SLVSP as well as mandatory and specific. Although the FAR policy is obviously mandatory and specific, we need not decide whether it is fundamental.

### III.
### *The CEQA Issue*

Friends' final contention proceeds like this: Assuming that its two SLVSP arguments are correct—meaning that the City Council did not comply with SLVSP policies 4-6 and 4-7—which were "adopted for the purpose of avoiding or mitigating negative impacts on aesthetics and visual resources," the aesthetic and visual effects of failure to comply with those policies "are indisputably considered environmental" under CEQA. It follows, Friends argues, "that the Initial Study prepared [by the City] under CEQA wrongfully

26

determined the Project would have no significant impacts on land use and planning."

Resolution of this issue is predicated on the existence of adverse environmental impacts if Friends prevails on its contentions that approval of the project violated the SLVSP. Friends has established the first violation but not the second. It is thus apparent that this final issue cannot be resolved at this time but must await further action by the trial court.

## DISPOSITION

The judgment is reversed, and the cause is remanded to the trial court for further proceedings in accordance with this opinion. Friends shall recover its costs on appeal.

 

_____

STEWART, P.J.

I concur.

_____

RICHMAN, J.

_Friends of South Livermore v. City of Livermore_ (A162471)

*Friends of South Livermore v. City of Livermore*, A162471

Dissenting Opinion of Van Aken, J.

I agree with the majority that Friends has failed to show that the City excluded required floor area from its FAR calculation and concur in the majority's affirmance of the trial court's decision on this point. I also agree with the majority's recitation of the legal standards and governing law that applies to this case. As the majority correctly sets out, a general plan adopted pursuant to Government Code section 65300 is a "constitution for all future developments" within the jurisdiction, and virtually any local development decision must be consistent with it. (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570–571.) A specific plan, like the SLVSP at issue here, is used to implement the general plan within a smaller geographic area (Gov. Code, §§ 65450, 65454), and all subordinate land use decisions must be consistent with it. I also agree with the majority that while judicial review of local land use decisions is deferential, we may not countenance local approval of a project " 'if it conflicts with a general plan policy that is fundamental, mandatory, and clear.' [Citations.]" (*Spring Valley Lake Assn. v. City of Victorville* (2016) 248 Cal.App.4th 91, 100–101.) Our task is to determine whether a project directly conflicts with mandatory and specific policies such that " 'no reasonable person' " could conclude they were consistent. (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 518.)

I respectfully depart from the majority, however, in its conclusion that a 100-foot setback, planted with agricultural crops, from the portion of Hansen Road west of Arroyo Road is such a fundamental, mandatory, and clear policy, for two reasons. First, in my view, the SLVSP does not unambiguously and clearly state that there must be a 100-foot agricultural

1

setback from public roads that were not yet in existence at the time the SLVSP was adopted.  As the majority correctly points out, the SLVSP's " 'Policy 4-7' " states that " '[b]uilding setbacks for commercial uses shall be 100 feet from road frontages . . . [and] planted with vineyards or orchards.' " And the " 'Commercial Design Standards & Guidelines' " state that " '[a] 100 foot planted building setback is required from all public roadways for every commercial site . . . .' " (Maj. opn., *ante*, at p. 16.)  Taken alone, these policies might suggest a mandatory and specific command to set back commercial uses from all past or future roadways, but the SLVSP also includes diagrams of potential future developments as exemplary applications of the design standards, and these diagrams suggest that the 100-foot setback requirement does not apply to roadways that were not yet in existence, as the trial court concluded.  In particular, the diagram shown below depicts site 5D2, the site at issue here planned for a wine country inn, with the planned but not-yet extant extension of Hansen Road on its northern side between sites 5D2 and 5D1.  The diagram depicts and labels a 100-foot agricultural setback on both sides of Arroyo Road.  But the plantings along the contemplated Hansen Road extension are depicted differently in the diagram:  they are narrower, and appear to be planted with something other than even rows of agricultural crops.



**PROTOTYPICAL SITE PLANS - SITES 4C, 5D1 and 5D2**

The other diagram of potential exemplary future uses of site 5D2 is similar; it states that there is a "[r]equired setback" of "100 feet from Arroyo Road," but it does not state or label that setbacks are required from any other road, including the planned future extension of Hansen Road, and it depicts a shrub screen rather than agricultural crops along Hansen Road to the north of site 5D2.

3

In my view, these SLVSP diagrams at a minimum create ambiguity in the specific plan as to whether the plan commands a 100-foot agricultural setback along the not-yet extant portion of Hansen Road, and they undermine any claim that this command is mandatory and clear. Where a specific plan is ambiguous, local officials are accorded "great deference" in interpreting it. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142.) Because I believe that a reasonable person could interpret the SLVSP as the Livermore City Council and the trial court did, I disagree with the majority's contrary determination.

As a second and independent reason why I depart from the majority's view on this issue, I conclude that even if the SLVSP includes an unambiguous and mandatory command that commercial uses have a 100-foot agricultural setback from all existing and future public roadways, this policy is not "fundamental" such that the Livermore City Council may not forego it in order to serve other aims set out in the SLVSP. Here, the record reflects that a PUD permit was approved in 2001 setting out commercial development standards for site 5D2 and other nearby sites, and this permit specified that 50-foot setbacks from Hansen Road were required. I agree with the majority that the approval of a PUD permit cannot amend or modify a general plan or a specific plan, but I view the 2001 PUD permit as casting doubt on the claim that a 100-foot setback from Hansen Road is "fundamental"; the permit was approved close in time to the 1997 SLVSP and has stood for 20 years without apparent challenge. In my view, this suggests that it is at least debatable how important a 100-foot setback from Hansen Road was to the policies and goals of the SLVSP, and I would defer to the Livermore City Council's interpretation of the importance of this requirement relative to other goals of the SLVSP, such as enabling the development of a

4

wine country inn as specified in the SLVSP. (See *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 239 [finding that "any inconsistency that exists here is not fundamental" where deviation from mandatory 50-foot buffers from creeks required by general plan would "likely conflict[]" with other general plan policies].)

For these reasons, I respectfully dissent and would affirm the trial court's resolution of the SLVSP issues presented by this case.

_____
Van Aken, J.*

*Friends of South Livermore v. City of Livermore* (A162471)

      * Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.